PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-3575
_____

CBS CORPORATION;
CBS BROADCASTING INC.;
CBS TELEVISIONSTATIONS INC.;
CBS STATIONS GROUP OF TEXAS L.P.;
and KUTV HOLDINGS, INC.,
Petitioners

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,
Respondents
_____

Petition for Review of Orders of the
Federal Communications Commission
FCC Nos. 06-19 and 06-68
_____

Argued September 11, 2007
Decided July 21, 2008

Certiorari Granted, Judgment Vacated and Remanded
from the Supreme Court of the United States
May 4, 2009

Argued on Remand from the
Supreme Court of the United States
February 23, 2010

Before: SCIRICA, RENDELL and FUENTES,
*Circuit Judges*

(Opinion Filed November 2, 2011)
_____

Robert Corn-Revere, Esq.    **(ARGUED)**
Davis Wright Tremaine LLP
1919 Pennsylvania, N.W., Suite 200
Washington, D.C. 20005

Jerome J. Shestack, Esq.
WolfBlock
1650 Arch Street, 22nd Floor
Philadelphia, Pennsylvania 19103

Nancy Winkelman, Esq.
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
   *Counsel for Petitioners*

Jacob M. Lewis, Esq.    **(ARGUED)**
Joseph R. Palmore, Esq.
Nandan M. Joshi, Esq.

Federal Communications Commission
Office of General Counsel
445 12th Street, S.W.
Washington, D.C. 20554

Eric D. Miller, Esq.
Thomas M. Bondy, Esq.
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W., Room 5634
Washington, D.C. 20530
   *Counsel for Respondents*

John B. Morris, Jr., Esq.
Center for Democracy & Technology
1634 I Street, N.W., Suite 1100
Washington, D.C. 20006
   *Counsel for Amici Curiae-Petitioners,*
   *Center for Democracy & Technology and*
   *Adam Thierer, Senior Fellow,*
   *The Progress & Freedom Foundation*

Andrew J. Schwartzman, Esq.
Media Access Project
1625 K Street, N.W., Suite 1000
Washington, D.C. 20006
   *Counsel for Amicus Curiae-Petitioner,*
   *Center for Creative Voices in Media, Inc.*

Carter G. Phillips, Esq.
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005

3

*Counsel for Amicus Curiae-Petitioner,*
*Fox Television Stations, Inc.*

Christopher T. Craig, Esq.
Sparks & Craig LLP
6862 Elm Street, Suite 360
McLean, Virginia 22101
    *Counsel for Amicus Curiae-Respondents,*
    *Parents Television Council, Inc.*

Thomas B. North
    *Pro Se Amicus Curiae-Respondent*

David P. Affinito, Esq.
Dell'Italia Affinito & Santola
18 Tony Galento Plaza
Orange, New Jersey 07050
    *Counsel for Amicus Curiae-Respondent,*
    *Morality In Media, Inc.*

Steven H. Aden, Esq.
Alliance Defense Fund
801 G Street, N.W., Suite 509
Washington, D.C. 20001
*Counsel for Amici Curiae-Respondents,*
*Focus on the Family, Morality In Media, Inc.*
*and Family Research Council*

————————————

OPINION OF THE COURT

————————————

4

RENDELL, *Circuit Judge*.

This matter comes before us on remand from the United States Supreme Court in light of its ruling in *F.C.C. v. Fox Television Stations, Inc.*, 129 S. Ct. 1800 (2009). This case, like *Fox*, involves a tightening of the Federal Communications Commission's standards for the broadcast of fleeting indecent material. *Fox* concerned the FCC's decision to abandon its safe harbor for expletives that are not repeated; this case considers the FCC's departure from its earlier policy exempting fleeting images from the scope of actionable indecency. While we can understand the Supreme Court's desire that we re-examine our holdings in light of its opinion in *Fox* — since both involve the FCC's policy regarding "fleeting material" — in Part A of this opinion we conclude that, if anything, *Fox* confirms our previous ruling in this case and that we should readopt our earlier analysis and holding that the Commission acted arbitrarily in this case. *See CBS Corp. v. F.C.C.*, 535 F.3d 167 (3d Cir. 2008), *vacated by F.C.C. v. CBS Corp.*, 129 S. Ct. 2176 (2009). Accordingly, in Part B of this opinion we again set forth our reasoning and conclusion that the FCC failed to acknowledge that its order in this case reflected a policy change and improperly imposed a penalty on CBS for violating a previously unannounced policy. *See id.* at 188-89. We have reconsidered certain other aspects of our previous opinion and will not remand, but, instead, will rule in Part B that CBS's petition for review is granted in toto.

## Part A:  Our Prior Opinion and the Impact of *Fox*

### I.

The treatment of fleeting indecency over the airwaves has been the subject of much consideration by the FCC and the courts over the last thirty years.  This case involves a February 1, 2004 incident:  the exposure, for nine-sixteenths of one second, of Janet Jackson's bare right breast during the live halftime performance of the National Football League's Super Bowl XXXVIII.[1]  The FCC issued a forfeiture order against CBS in March 2006, imposing a penalty of $550,000. *See In re Complaints Against Various Television Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show*, 21 F.C.C.R. 2760 (2006) ("Forfeiture Order").  We described the FCC's reasoning in our previous opinion:

> Affirming its preliminary findings, the Commission concluded the Halftime Show broadcast was indecent because it depicted a sexual organ and violated "contemporary community standards for the broadcast medium."  *Id.* at ¶ 10.  In making this determination, the FCC relied on a contextual analysis to find the broadcast of Jackson's exposed breast was: (1) graphic and explicit, (2) shocking and pandering, and (3) fleeting.  *Id.* at ¶ 14.  It further concluded that the brevity of the

---

[1] Our original opinion in this matter provided additional factual and procedural background.  *See CBS Corp.*, 535 F.3d at 171-74.

6

image was outweighed by the other two factors. *Id.* The standard applied by the Commission is derived from its 2001 policy statement setting forth a two-part test for indecency: (1) "the material must describe or depict sexual or excretory organs or activities," and (2) it must be "patently offensive as measured by contemporary community standards for the broadcast medium." *In re Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding Broadcast Indecency*, 16 F.C.C.R. 7999, 8002 ¶¶ 7-8 (2001) (emphasis in original) . . . .

Additionally, the FCC determined CBS's actions in broadcasting the indecent image were "willful" and therefore sanctionable by a monetary forfeiture under 47 U.S.C. § 503(b)(1). *See Forfeiture Order* at ¶ 15.

*CBS Corp.*, 535 F.3d at 172. CBS sought reconsideration under 47 C.F.R. § 1.106, which the FCC denied. *See In re Complaints Against Various Television Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show*, 21 F.C.C.R. 6653 (2006). Neither of these two orders acknowledged, much less explained, any change in the FCC's enforcement policy for fleeting indecent images.

CBS filed a petition for review in our Court, contending that the FCC's ruling that the fleeting nude image was actionable indecency constituted a change in policy, and its application to CBS was, therefore, arbitrary and capricious

under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Specifically, CBS urged that, before the incident in question, FCC policy provided that the "isolated use of expletives in broadcasts did not constitute actionable indecency under 18 U.S.C. § 1464." *CBS Corp.*, 535 F.3d at 176 (citing *See In re Application of Pacifica Found.*, 95 F.C.C.2d 750 (1983)).

The FCC defended its actions on the basis that its earlier fleeting-material policy applied only to fleeting utterances and did not extend to fleeting images.[2] We rejected this contention:

> During a span of nearly three decades, the Commission frequently declined to find broadcast programming indecent, its restraint punctuated only by a few occasions where programming contained indecent material so pervasive as to amount to "shock treatment" for the audience. Throughout this period, the Commission consistently explained that isolated or fleeting material did not fall within the scope of actionable indecency.

---

[2] The FCC abandoned its "restrained enforcement policy for fleeting broadcast material," at least as it applied to fleeting expletives, in its March 2004 order in *In re Complaints Against Various Broadcast Licensees Regarding the Airing of the "Golden Globe Awards" Program*, 19 F.C.C.R. 4975 (2004) ("*Golden Globes*"). *See CBS Corp.*, 535 F.3d at 180. Because that policy change post-dated the February 2004 broadcast at issue in this case, it cannot serve as the basis for the penalty imposed on CBS. *See id.* at 180-81.

At the time the Halftime Show was broadcasted by CBS, the FCC's policy on fleeting material was still in effect. The FCC contends its restrained policy applied only to fleeting utterances — specifically, fleeting expletives — and did not extend to fleeting images. But a review of the Commission's enforcement history reveals that its policy on fleeting material was never so limited. The FCC's present distinction between words and images for purposes of determining indecency represents a departure from its prior policy.

*Id.* at 174-75.

Reviewing in detail the progression of FCC rulings leading up to the present, we could not find the distinction advocated by the FCC. Indeed, we could only reach the opposite conclusion:

[T]he balance of the evidence weighs heavily against the FCC's contention that its restrained enforcement policy for fleeting material extended only to fleeting words and not to fleeting images. As detailed, the Commission's entire regulatory scheme treated broadcasted images and words interchangeably for purposes of determining indecency. Therefore, it follows that the Commission's exception for fleeting material under that regulatory scheme likewise treated images and words alike. Three decades of FCC action support this conclusion.

9

Accordingly, we find the FCC's conclusion on this issue, even as an interpretation of its own policies and precedent, "counter to the evidence before the agency" and "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Id.* at 188 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Thus, we found that the ruling in this case represented a departure from prior policy that required an explanation:

The Commission's determination that CBS's broadcast of a nine-sixteenths of one second glimpse of a bare female breast was actionably indecent evidenced the agency's departure from its prior policy. Its orders constituted the announcement of a policy change — that fleeting images would no longer be excluded from the scope of actionable indecency . . . .

[A]n agency cannot ignore a substantial diversion from its prior policies. *See Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) (agency must "provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"). As the Supreme Court explained in *State Farm*, an agency must be afforded great latitude to change its policies, but it must justify its actions by articulating a reasoned analysis behind the change . . . .

10

*CBS Corp.*, 535 F.3d at 181-82 (citing *State Farm*, 463 U.S. at 42-43).

We then noted that in *Fox Television Stations, Inc. v. F.C.C.*, the United States Court of Appeals for the Second Circuit had analyzed under *State Farm* the FCC's change in its fleeting-expletive policy (announced in its *Golden Globes* order, after the 2004 Halftime Show broadcast at issue here) and had "rejected the agency's proffered rationale as 'disconnected from the actual policy implemented by the Commission.'" *Id.* at 183 (quoting 489 F.3d 444, 459 n.8 (2d Cir. 2007), *rev'd*, *Fox*, 129 S. Ct. 1800). We then distinguished the FCC's actions in *Fox* from its order in this case:

> There, as Judge Leval noted in dissent, the FCC provided an explanation for changing its policy on fleeting expletives. The critical question splitting the court was whether that explanation was adequate under *State Farm*. *Here, unlike in Fox, the FCC has not offered any explanation — reasoned or otherwise — for changing its policy on fleeting images.* Rather, the FCC asserts it never had a policy of excluding fleeting images from the scope of actionable indecency, and therefore no policy change occurred when it determined that the Halftime Show's fleeting image of Janet Jackson's breast was actionably indecent.

*Id.* (emphasis added). Because our analysis of three decades of FCC enforcement contradicted the Commission's assertion in this regard, we concluded that "the FCC's new policy of

11

including fleeting images within the scope of actionable indecency is arbitrary and capricious under *State Farm* and the Administrative Procedure Act, and therefore invalid as applied to CBS." *Id.* at 189.

We next engaged in a discussion regarding the degree of scienter necessary for the imposition of a forfeiture, and concluded the opinion by remanding to the agency, finding this course of action to be appropriate where the agency has issued an arbitrary decision. *See id.* at 209.

Eight months later the Supreme Court issued its decision in *Fox*, on certiorari from the Second Circuit. *See Fox*, 129 S.Ct. 1800. As noted above, the issue in that case was "the adequacy of the Federal Communications Commission's *explanation* of its decision that [the statutory prohibition on indecent language] sometimes forbids the broadcasting of indecent expletives even when the offensive words are not repeated," not, as here, the question whether the FCC's order amounted to a policy change.[3] *Id.* at 1805 (emphasis added).

---

[3] In this regard, the Supreme Court noted that, in the orders at issue in *Fox*:

> The Commission forthrightly acknowledged that its recent actions have broken new ground, taking account of inconsistent "prior Commission and staff action" and explicitly disavowing them as "no longer good law." *Golden Globes*, 19 F.C.C.R. at 4980 . . . . There is no doubt that the Commission knew it was making a change. That is why it declined to

12

The Court reviewed the statutory and regulatory background in the introductory section of the opinion, concluding with a discussion of the FCC's ruling in *Golden Globes*, where "the Commission took one step further by declaring for the first time that a nonliteral (expletive) use of the F- and S-Words could be actionably indecent, even when the word is used only once," *Fox*, 129 S. Ct. at 1807. The Supreme Court observed:

> The [*Golden Globes*] order acknowledged that "prior Commission and staff action have indicated that isolated or fleeting broadcasts of the 'F-Word' . . . are not indecent or would not be acted upon." It explicitly ruled that "any such interpretation is no longer good law." It "clarif[ied] . . . that the mere fact that specific words or phrases are not sustained or repeated does not mandate a finding that material that is otherwise patently offensive to the broadcast medium is not indecent." Because, however, "existing precedent would have permitted this broadcast," the Commission determined that "NBC and its affiliates necessarily did not have the requisite notice to justify a penalty."

*Id.* at 1808 (internal citations omitted).

--------

assess penalties; and it relied on the Golden Globes Order as removing any lingering doubt. *Remand Order*, 21 F.C.C.R. at 13308.

*Fox*, 129 S. Ct. at 1812.

13

The Court next considered the case before it, which involved two instances of celebrities' use of the "F-Word" in live broadcasts. *Id.* (discussing Cher's and Nicole Richie's statements at two consecutive Billboard Music Awards broadcasts). The Commission had initially issued Notices of Apparent Liability, but imposed no fines. *See In re Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005*, 21 F.C.C.R. 2664 (2006). In further proceedings, the Commission gave Fox the opportunity to object, then upheld the indecency findings. *See In re Complaints Regarding Various Television Broadcasts Between February 2, 2002, and March 8, 2005*, 21 F.C.C.R. 13299 (2006) ("Remand Order"). The FCC's order explained its reason for departing from the position that fleeting expletives were exempt from otherwise applicable indecency standards:

> In the Commission's view, "granting an automatic exemption for 'isolated or fleeting' expletives unfairly forces viewers (including children)" to take "'the first blow'" and would allow broadcasters "to air expletives at all hours of a day so long as they did so one at a time."

*Fox*, 129 S. Ct. at 1809 (internal citations omitted). The FCC appeared to hedge to some degree as to the extent of, and timing of, its change in policy for fleeting material, but, as the Supreme Court noted, it "made clear [that] the *Golden Globes* Order eliminated any doubt that fleeting expletives could be actionably indecent, and the Commission disavowed the bureau-level decisions and its own dicta that had said otherwise." *Id.* (internal citations omitted).

14

Regarding the adequacy of the FCC's explanation for its policy change, the Court rejected the Second Circuit's view that an agency must "make clear 'why the original reasons for adopting the [displaced] rule or policy are no longer dispositive' as well as 'why the new rule effectuates the statute as well as or better than the old rule.'" *Fox*, 129 S. Ct. at 1810 (quoting *Fox*, 489 F.3d at 456-57) (internal quotations omitted; alteration in original). It held:

> To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books. *See United States v. Nixon*, 418 U.S. 683 (1974). And of course the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates.

*Id.* at 1811.

The Court concluded that, in that case, the Commission's "reasons for expanding the scope of its enforcement activity were entirely rational":

15

It was certainly reasonable to determine that it made no sense to distinguish between literal and nonliteral uses of offensive words, requiring repetitive use to render only the latter indecent. As the Commission said with regard to expletive use of the F-Word, "the word's power to insult and offend derives from its sexual meaning." And the Commission's decision to look at the patent offensiveness of even isolated uses of sexual and excretory words fits with the context-based approach we sanctioned in [*F.C.C. v. Pacifica Foundation*], 438 U.S. [726], 750 [(1978)]. Even isolated utterances can be made in "pander[ing,] . . . vulgar and shocking" manners, and can constitute harmful "'first blow[s]'" to children. It is surely rational (if not inescapable) to believe that a safe harbor for single words would "likely lead to more widespread use of the offensive language."

*Fox*, 129 S. Ct. at 1812-13 (internal citations omitted). Notably, the Court's discussion of the Commission's action concluded with the following statement: "[T]he agency's decision not to impose any forfeiture or other sanction precludes any argument that it is arbitrarily punishing parties without notice of the potential consequences of their action." *Id.* at 1813.

Accordingly, the Court reversed the Second Circuit's order and upheld the FCC's decision.

**II.**

We must decide the extent to which *Fox* affects our previous ruling in this case. We conclude that, if anything, the Supreme Court's decision fortifies our original opinion, in two ways.

For one thing, in *Fox*, unlike in this case, the FCC acknowledged that its orders had "broken new ground," as noted above. *See* 129 S. Ct. at 1812. The Supreme Court specifically noted that the FCC's "decision not to impose any forfeiture or other sanction" in that case signaled its recognition that assessing penalties based on violations of previously unannounced policies would amount to "arbitrarily punishing parties without notice of the potential consequences of their actions." *Id.* at 1813. The same logic implies that the FCC erred in imposing a fine on CBS in this case, as the chronology of events that are the subject of these cases demonstrates.

The FCC Enforcement Bureau's original, 2003 ruling in *Golden Globes* applied its then-controlling policy of exempting all fleeting indecent material from enforcement, determining that the singer Bono's use of the "F- Word" ("this is really, really f-- brilliant") did "not fall within the scope of the Commission's indecency prohibition." *CBS Corp.*, 535 F.3d at 177 (quoting *In re Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program*, 18 F.C.C.R. 19859, ¶ 6 (FCC Enforcement Bureau 2003)). But, in March 2004, the full Commission reversed the Enforcement Bureau's decision, overruling all of its prior cases that held fleeting expletives were not actionable. The Commission declined to impose a

17

penalty on the *Golden Globes* broadcasters, however, because "'existing precedent would have permitted [the Golden Globe Awards] broadcast' and therefore it would be 'inappropriate' to sanction licensees for conduct prior to notice of policy change." *Id.* at 178 (quoting *Golden Globes*, 19 F.C.C.R. at 4981-82).

The expletive utterances by Cher and Nicole Richie that were considered in *Fox* took place, respectively, during the 2002 and 2003 Billboard Music Awards telecasts, before the full Commission's March 2004 *Golden Globes* decision. Accordingly, and applying the same rationale as in *Golden Globes*, the FCC declined to impose a fine. As the *Fox* Court observed and affirmed, the decision not to impose a fine in that case signaled the FCC's understanding that imposing sanctions for conduct that occurred before the FCC's policy change was announced would raise due process concerns. *See Fox*, 129 S. Ct. at 1813.

The same principle applies here. The relevant Halftime Show broadcast occurred in February 2004, *preceding* the FCC's ruling in *Golden Globes*. But despite its earlier consistent policy exempting all fleeting material — words *and* images — from its indecency rules, *see CBS Corp.*, 535 F.3d at 188, the FCC assessed a fine against CBS. *Fox* confirms our earlier observation that because the Commission did not announce any change in its fleeting-material policy until March 2004, and because the offensive conduct in this case (like the offending conduct in *Golden Globes* and *Fox*) *preceded* that date, the FCC's assessment of a forfeiture and imposition of a penalty against CBS constitutes arbitrary, and therefore unlawful, punishment.

*Fox*, 129 S. Ct. at 1813; *see also CBS Corp.*, 535 F.3d at 180-81.

The FCC and our dissenting colleague contend that, in all events, the FCC's decision in *Young Broadcasting of San Francisco, Inc.*, 19 F.C.C.R. 1751 (2004), issued just days before CBS's Halftime Show, provided CBS with adequate notice that the FCC might impose a forfeiture for fleeting nude images. But as we pointed out in our earlier opinion, the 2004 *Young Broadcasting* decision was a non-final notice of apparent liability; "the final disposition of *Young Broadcasting* was still unresolved" at the time of the Halftime Show broadcast. *Id.* at 187 & n.18. The decision therefore reflects only "tentative conclusions" of the FCC, and, in our view, provides insufficient notice of the FCC's official policy on fleeting nude images, particularly when viewed in the context of the agency's consistent refusal over three decades to consider such fleeting material indecent, to justify the imposition of sanctions against CBS.

Therefore, we must reaffirm our conclusion that the penalty imposed in this case is arbitrary unless we find, contrary to the extensive analysis in our earlier opinion, that the FCC's pre-*Golden Globes* fleeting-material policy did not also apply to fleeting images. But, here again, *Fox* supports our previous conclusion. The Commission, and our dissenting colleague, point to one small portion of the background section in the Supreme Court's lengthy *Fox* opinion as support for the position that the FCC's fleeting-material policy never applied to images but was always restricted to words. But we discern no such meaning in the relevant passage, which briefly observed:

19

Although the Commission had expanded its enforcement beyond the "repetitive use of specific words or phrases," it preserved a distinction between literal and nonliteral (or "expletive") uses of evocative language. The Commission explained that each literal "description or depiction of sexual or excretory functions must be examined in context to determine whether it is patently offensive," but that "deliberate and repetitive use . . . is a requisite to a finding of indecency" when a complaint focuses solely on the use of nonliteral expletives.

129 S. Ct. at 1807 (quoting *In re Pacifica Found., Inc.*, 2 F.C.C.R. 1191, 2699, ¶ 13 (1987)).

The FCC argues that images fall into the category of literal "descriptions or depictions" of sexual organs or functions, and that the Court's language indicates that the FCC's previous fleeting-material policy applied only to non-literal, or expletive, depictions or descriptions, and not, as we previously concluded, to fleeting images as well as expletives. We disagree.

First, we do not see how this summary recitation of the Commission's opinions affects the reasoning or result in our case. It appears in the Court's background discussion of the FCC's historical approach to indecent language, and is neither reasoning nor holding; it is mere characterization. Second, this language narrowly addresses *words and phrases*, with no discussion of images. Although the phrase "description or depiction," considered in isolation, could be construed to

include images, Justice Scalia is paraphrasing the language of the FCC's 1987 *Pacifica Foundation* opinion, involving words alone, in which the complete phrase used by the FCC was "speech involving the description or depiction of sexual or excretory functions."[4]  *In re Pacifica Found., Inc.*, 2

---

[4] The full text of the relevant paragraph from *Pacifica Foundation* is as follows:

> While *speech that is indecent must involve more than an isolated use of an offensive word . . . , repetitive use of specific words or phrases* is not an absolute requirement for a finding of indecency.  If a complaint focuses solely on the use of expletives, we believe that under the legal standards set forth in *Pacifica*, deliberate and repetitive use in a patently offensive manner is a requisite to a finding of indecency.  When a complaint goes beyond the use of expletives, however, *repetition of specific words or phrases* is not necessarily an element critical to a determination of indecency. Rather, *speech involving the description or depiction of sexual or excretory functions* must be examined in context to determine whether it is patently offensive

F.C.C.R. 2698, 2699 ¶ 13 (1987), *quoted in Fox*, 129 S. Ct. at 1807.  As the dissent concedes, dissenting op. at 26-27 n.7, *Fox* says nothing at all about images.  Nor does it suggest that the FCC's previous fleeting-material policy applied only to "words," or distinguished between words and images, as the Commission originally argued to us (an argument we forcefully rejected after reviewing three decades of rulings). Indeed, the *Fox* Court had no occasion to consider the application of the FCC's pre-*Golden Globes* fleeting-material policy to images, since that case involved the use of spoken fleeting expletives.[5]

---

> under contemporary community standards applicable to the broadcast medium.  The mere fact that *specific words or phrases* are not repeated does not mandate a finding that material that is otherwise patently offensive to the broadcast medium is not indecent.

2 F.C.C.R. at 2699 ¶ 13 (emphases added).

[5] Our dissenting colleague contends that the Supreme Court's omission of any discussion of fleeting images in *Fox* "strongly suggests" that images never fell within the FCC's fleeting-material policy.  Dissenting op. at 28.  By contrast, we are unwilling to read the Court's *silence* as overruling our conclusion, based on a careful review of three decades of FCC precedent to discern the agency's policy on precisely this issue, that the FCC historically did not distinguish between fleeting images and words.  *See* 535 F.3d at 188 ("[T]he Commission's entire regulatory scheme treated

More to the point, read in context, this language does not refer to the FCC's pre-*Golden Globes* fleeting-material policy *at all*. Instead, it describes the evolution of the Commission's overall approach to a separate issue, i.e., whether "its enforcement power was limited to 'deliberate, repetitive use of the seven words actually contained in the George Carlin monologue.'"[6] *Id.* at 1807 (quoting *Pacifica Found.*, 2 F.C.C.R. at 2699 ¶ 12). Critically, the relevant portion of the *Pacifica Foundation* opinion that *Fox* quoted clearly distinguished between these two concepts, explaining that "speech that is indecent must involve more than an isolated," i.e., fleeting, "use of an offensive word," but that "repetitive use of *specific words or phrases*" (i.e., the expletive words or phrases from the Carlin monologue) was not required. *Pacifica Found.*, 2 F.C.C.R. at 2699 ¶ 13 (emphasis added). The Supreme Court in the quoted language from *Fox*, and the FCC in the *Pacifica Foundation* opinion that *Fox* quoted, were focused entirely on the FCC's earlier policy (arising out of the Carlin monologue) regarding the "'use of specific words or phrases'" as a prerequisite to a finding of indecency, not the question whether the reference to a particular word or image that might otherwise be deemed indecent was passing or fleeting in nature. Just as *Fox* involved spoken fleeting expletives, not fleeting images,

---

broadcasted images and words interchangeably for purposes of determining indecency. Therefore, it follows that the Commission's exception for fleeting material under that regulatory scheme likewise treated words and images alike."). Images simply were not involved in the case.

[6] See *Fox*, 129 S. Ct. at 1806, and *CBS Corp.*, 535 F.3d at 175, for additional background on the Carlin monologue.

*Pacifica Foundation* involved sustained, repeated use of expletives and sexually explicit language, not fleeting words or images.[7]

Moreover, the very next paragraph of *Fox* confirms that neither the Supreme Court nor the FCC interpreted *Pacifica Foundation*'s distinction between literal and non-literal uses of specific words or phrases to impact the otherwise applicable policy for fleeting material. *Fox*, 129 S. Ct. at 1807. In that paragraph, quoting an FCC policy statement from 2001, the Court made clear that, even after *Pacifica Foundation*, the exception for fleeting material still applied, separate and apart from any distinction arising between "literal" and "non-literal" words referring to sexual or excretory functions. Quoting a 2001 FCC policy statement, the Court said, "'No single factor,' the Commission said, 'generally provides the basis for an indecency finding,' but 'where sexual or excretory references have been made once or *have been passing or fleeting in nature*, this characteristic has tended to weigh against a

---

[7] *Pacifica Foundation* concerned a radio station's airing of a program entitled "Shocktime America," which allegedly contained a narration and song lyrics using words and phrases such as "eat shit," "mother-fucker," and "fuck the U.S.A.," and a program featuring excerpts from a play with dramatic readings of sexual fantasies and containing language highly descriptive of sexual and excretory activities. Pacifica defended that the Shocktime remarks were not scripted, and asserted that the language of the play was taken out of context and the broadcast was at night when children would not be listening.

finding of indecency.'" *Fox*, 129 S. Ct. at 1807 (quoting *In re Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding Broadcast Indecency*, 16 F.C.C.R. 7999, 8003 ¶ 10, 8008 ¶ 17 (2001) ("*Industry Guidance*")) (emphasis added).[8]

If we were to read the Supreme Court's background discussion in *Fox* as indicating that the history of FCC enforcement in the area of fleeting material recognized an exception only for non-literal expletives, to the exclusion of images, we would be accusing the Supreme Court of rewriting history. This is because, in *Young Broadcasting*, which involved a fleeting image of a body part much like the one presented here, the Commission had the opportunity to explain that, after *Pacifica Foundation*, its fleeting-material policy did not apply to images. But the FCC did not say that, nor did it mention, much less rely on, *Pacifica Foundation* in analyzing the broadcast images at issue in that case.[9] *See Young Broadcasting*, 19 F.C.C.R. at 1755 ¶ 12 & n.35.

---

[8] Interestingly, we cited this exact language as evidence of the FCC's "restrained enforcement policy" for fleeting indecent material in our earlier opinion. *See CBS Corp.*, 535 F.3d at 177.

[9] Just as *Young Broadcasting* did not mention *Pacifica Foundation*'s literal / non-literal distinction, *Fox* does not reference or attempt to reconcile *Young Broadcasting*, confirming that the Court did not consider, much less decide, whether the FCC's pre-*Golden Globes* fleeting-material policy applied to images as well as words.

Instead, the FCC noted the fact that "the actual exposure of the performer's penis" in that case "was fleeting in that it occurred for less than a second." *Id.* It then compared the overall circumstances in the case to other cases in which it had applied the fleeting-material exception, and held that *Young Broadcasting* was different — an exception to the exception — because "the material was apparently intended to pander to, titillate and shock viewers" and because the station knew in advance that "the interview involved performers who appear nude in order to manipulate and stretch their genitalia," but "failed to take adequate precautions to ensure that no actionably indecent material was broadcast." *Id.* at 1755-56 ¶¶ 12-13 & n.35; *see also CBS Corp.*, 535 F.3d at 186 & n.16-17.

The Commission did not distinguish *Young Broadcasting* because it involved images rather than words, and its language demonstrates that it viewed the case as just another "instance" involving "fleeting remarks in live, unscripted broadcasts." *See Young Broadcasting*, 19 F.C.C.R. at 1755 ¶ 12 ("We reject Young's assertion that this material is equivalent to other instances in which the Commission has ruled that fleeting remarks in live, unscripted broadcasts do not meet the indecency definition."). As we pointed out in our previous *CBS* opinion, had the FCC believed that its fleeting-material policy categorically did not apply to sexually explicit images, it most certainly would have said so rather than relying on distinctions that could apply to all fleeting material — remarks and images alike. *Id.* at 187. The FCC has not persuaded us that the fleeting-material exception was ever limited to words or expletives, and it cannot do so when in *Young Broadcasting* it treated a fleeting image just as it would have treated fleeting words.

Considering all of these facts, we do not see any basis to conclude that *Fox* alters our previous analysis of the fleeting-material exception. At bottom, the Commission attempts to convert a passing reference in *Fox*'s background section into a holding that undermines what the opinion otherwise makes clear: an agency may not apply a policy to penalize conduct that occurred before the policy was announced. The Commission's argument also rewrites history, marginalizing the Supreme Court's recognition in *Fox* that *Golden Globes* reflected a clear change in FCC's fleeting-material policy, and ignoring the agency's consistent practice — over three decades before its order in this case — of exempting *all* fleeting material, whether words or images, from enforcement under its indecency policy.[10]

---

[10] Our prior opinion chronicled that history at length. As we discussed:

> The Commission's conclusion on the nature and scope of its indecency regime-including its fleeting material policy – is at odds with the history of its actions in regulating indecent broadcasts. In the nearly three decades between the Supreme Court's ruling in *Pacifica Foundation* and CBS's broadcast of the Halftime Show, the FCC had never varied its approach to indecency regulation based on the format of broadcasted content. Instead, the FCC consistently applied identical standards and engaged in identical analyses when reviewing complaints of potential indecency

Thus, we conclude that *Fox* does not alter our reasoning or initial resolution of this case.

## Part B:  Opinion Regarding the Merits

In reasoning through Part A of this opinion, we referred extensively to our prior opinion, which the Supreme Court vacated before remanding the case to us in light of *Fox*. While we ordinarily would simply reinstate our prior opinion after determining that *Fox* did not undermine it, we cannot do that here, for two reasons.  First, the previous opinion was a unanimous opinion authored by Judge Scirica, whereas the opinion we now will issue is non-unanimous, with Judge Scirica dissenting.  Second, the new majority does not believe that the earlier opinion's discussion of the scienter required for a violation was necessary, and we decline to readopt that portion of the analysis.

Accordingly, we do not reinstate our previous opinion. Instead, we incorporate below those portions of the opinion that we wish to readopt as part of our resolution of this case.[11]

---

whether the complaints were based on words or images.

*CBS Corp.*, 535 F.3d at 184.

[11] We incorporate the pertinent portions of our previous opinion as they were filed on July 21, 2008 and amended on August 6, 2008.  Thus, the citation information in Part B of our opinion is current as of that date and does not reflect any subsequent updates.

\* \* \*

In this petition for review, CBS appeals orders of the Federal Communications Commission imposing a monetary forfeiture under 47 U.S.C. § 503(b) for the broadcast of "indecent" material in violation of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. The sanctions stem from CBS's live broadcast of the Super Bowl XXXVIII Halftime Show, in which two performers deviated from the show's script resulting in the exposure of a bare female breast on camera, a deceitful and manipulative act that lasted nine-sixteenths of one second. CBS transmitted the image over public airwaves, resulting in punitive action by the FCC.

CBS challenges the Commission's orders on constitutional, statutory, and public policy grounds. Two of the challenges are paramount: (1) whether the Commission acted arbitrarily and capriciously under the Administrative Procedure Act, 5 U.S.C. § 706, in determining that CBS's broadcast of a fleeting image of nudity was actionably indecent; and (2) whether the Commission, in applying three theories of liability – traditional *respondeat superior* doctrine, an alternative theory of vicarious liability based on CBS's duties as a broadcast licensee, and the "willfulness" standard of the forfeiture statute – properly found CBS violated the indecency provisions of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. We will vacate the FCC's orders.

**I.**

On February 1, 2004, CBS presented a live broadcast of the National Football League's Super Bowl XXXVIII, which included a halftime show produced by MTV

29

Networks.[12]  Nearly 90 million viewers watched the Halftime Show, which began at 8:30 p.m. Eastern Standard Time and lasted about fifteen minutes.  The Halftime Show featured a variety of musical performances by contemporary recording artists, with Janet Jackson as the announced headlining act and Justin Timberlake as a "surprise guest" for the final minutes of the show.

Timberlake was unveiled on stage near the conclusion of the Halftime Show.  He and Jackson performed his popular song "Rock Your Body" as the show's finale.  Their performance, which the FCC contends involved sexually suggestive choreography, portrayed Timberlake seeking to dance with Jackson, and Jackson alternating between accepting and rejecting his advances.  The performance ended with Timberlake singing, "gonna have you naked by the end of this song," and simultaneously tearing away part of Jackson's bustier.  CBS had implemented a five-second audio delay to guard against the possibility of indecent language being transmitted on air, but it did not employ similar precautionary technology for video images.  As a result, Jackson's bare right breast was exposed on camera for nine-sixteenths of one second.

Jackson's exposed breast caused a sensation and resulted in a large number of viewer complaints to the Federal Communications Commission.[13]  In response, the

---

[12] At that time, both CBS and MTV Networks were divisions of Viacom, Inc.

[13] The record is unclear on the actual number of complaints received from unorganized, individual viewers.  In its brief,

Commission's Enforcement Bureau issued a letter of inquiry asking CBS to provide more information about the broadcast along with a video copy of the entire Super Bowl program. CBS supplied the requested materials, including a script of the Halftime Show, and issued a public statement of apology for the incident. CBS stated Jackson and Timberlake's wardrobe stunt was unscripted and unauthorized, claiming it had no advance notice of any plan by the performers to deviate from the script.

On September 22, 2004, the Commission issued a Notice of Apparent Liability finding CBS had apparently violated federal law and FCC rules restricting the broadcast of indecent material. After its review, the Commission determined CBS was apparently liable for a forfeiture penalty of $550,000.[14] CBS submitted its Opposition to the Notice of Apparent Liability on November 5, 2004.

---

the FCC asserts it received "'an unprecedented number' of complaints about the nudity broadcast during the halftime show." FCC Br. at 12 (citation omitted). CBS disputes the calculation and significance of the viewer complaints. *See* CBS Reply Br. at 15 n.6 ("Of the 'over 542,000 complaints concerning the broadcast' the FCC claims to have received, over 85 percent are form complaints generated by single-interest groups. Approximately twenty percent of the complaints are duplicates, with some individual complaints appearing in the record up to 37 times." (citations omitted)).

[14] This figure represented the aggregate of proposed penalties against individual CBS stations. At the time the Commission issued its Notice of Apparent Liability,

The Commission issued a forfeiture order over CBS's opposition on March 15, 2006, imposing a forfeiture penalty of $550,000. *In re Complaints Against Various Television Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show*, 21 F.C.C.R. 2760 (2006) ("*Forfeiture Order*"). Affirming its preliminary findings, the Commission concluded the Halftime Show broadcast was indecent because it depicted a sexual organ and violated "contemporary community standards for the broadcast medium." *Id*. at ¶ 10. In making this determination, the FCC relied on a contextual analysis to find the broadcast of Jackson's exposed breast was: (1) graphic and explicit, (2) shocking and pandering, and (3) fleeting. *Id*. at ¶ 14. It further concluded that the brevity of the image was outweighed by the other two factors. *Id*. The standard applied by the Commission is derived from its 2001 policy statement setting forth a two-part test for indecency: (1) "the material must describe or depict sexual or excretory organs or activities," and (2) it must be "*patently offensive* as measured by contemporary community standards for the broadcast medium." *In re Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding Broadcast Indecency*, 16 F.C.C.R. 7999, 8002 ¶¶ 7-8 (2001) (emphasis in original). The Commission had informed broadcasters in its 2001 policy statement that in performing the second step of the test – measuring the offensiveness of any particular broadcast – it would look to three factors: "(1) the explicitness or graphic nature of the

forfeiture penalties for indecency violations were statutorily capped at $27,500. The Commission proposed the maximum penalty for each CBS station.

description or depiction of sexual or excretory organs or activities; (2) whether the material dwells on or repeats at length descriptions of sexual or excretory organs or activities; (3) whether the material appears to pander or is used to titillate, or whether the material appears to have been presented for its shock value." *Id*. at ¶ 10 (emphasis omitted).

Additionally, the FCC determined CBS's actions in broadcasting the indecent image were "willful" and therefore sanctionable by a monetary forfeiture under 47 U.S.C. § 503(b)(1). *See id*. at ¶ 15. Adopting the definition of "willful" found in section 312(f)(1) of the Communications Act,[15] the Commission offered three explanations for its determination of willfulness. *Id*. First, the FCC found CBS "acted willfully because it consciously and deliberately broadcast the halftime show, whether or not it intended to broadcast nudity . . . ." *Id*. Second, the FCC found CBS acted willfully because it "consciously and deliberately failed to take reasonable precautions to ensure that no actionably indecent material was broadcast." *Id*. Finally, the FCC applied a *respondeat superior* theory in finding CBS vicariously liable for the willful actions of its agents, Jackson and Timberlake. *Id*.

---

[15] This section of the Communications Act provides: "The term 'willful', when used with reference to the commission or omission of any act, means the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this Act or any rule or regulation of the Commission authorized by this Act or by a treaty ratified by the United States." 47 U.S.C. § 312(f)(1).

33

On April 14, 2006, CBS submitted a Petition for Reconsideration under 47 C.F.R. § 1.106, raising several arguments against the Commission's findings and conclusions. In its Order on Reconsideration, the FCC rejected CBS's statutory and constitutional challenges and reaffirmed its imposition of a $550,000 forfeiture. *In re Complaints Against Various Television Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show*, 21 F.C.C.R. 6653 (2006) ("*Reconsideration Order*"). The *Reconsideration Order* revised the Commission's approach for determining CBS's liability under the willfulness standard. The Commission reiterated its application of vicarious liability in the form of *respondeat superior* and its determination that CBS was directly liable for failing to take adequate measures to prevent the broadcast of indecent material. *See id*. at ¶ 16. But it abandoned its position that CBS acted willfully under 47 U.S.C. § 503(b)(1) by intentionally broadcasting the Halftime Show irrespective of its intent to broadcast the particular content included in the show. Instead, it determined CBS could be liable "given the nondelegable nature of broadcast licensees' responsibility for their programming." *Id*. at ¶ 23. The Commission has since elaborated on this aspect of the *Reconsideration Order*, explaining it as a separate theory of liability whereby CBS can be held vicariously liable even for the acts of its independent contractors because it holds non-delegable duties as a broadcast licensee to operate in the public interest and to avoid broadcasting indecent material. *See, e.g.*, FCC Br. at 44-45.

CBS timely filed a petition for review of the *Reconsideration Order* on July 28, 2006. It challenges the

34

FCC's orders on several grounds, and both parties are supported by briefing from several amici.

## II.

Our standard of review of agency decisions is governed by the Administrative Procedure Act, 5 U.S.C. § 706. Under the Administrative Procedure Act, we "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706(2)(A); *see, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983).

The scope of review under the "arbitrary and capricious" standard is "narrow, and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Nevertheless, the agency must reach its decision by "examin[ing] the relevant data," and it must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). We generally find agency action arbitrary and capricious where:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not

35

> attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Id.* at 43 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Our review of the constitutional questions is more searching. In cases raising First Amendment issues, we have "an obligation 'to make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *United States v. Various Articles of Merch.*, *Schedule No. 287*, 230 F.3d 649, 652 (3d Cir. 2000) (quoting *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984) (citations omitted)).

## III.

The FCC possesses authority to regulate indecent broadcast content, but it had long practiced restraint in exercising this authority. During a span of nearly three decades, the Commission frequently declined to find broadcast programming indecent, its restraint punctuated only by a few occasions where programming contained indecent material so pervasive as to amount to "shock treatment" for the audience. Throughout this period, the Commission consistently explained that isolated or fleeting material did not fall within the scope of actionable indecency.

At the time the Halftime Show was broadcasted by CBS, the FCC's policy on fleeting material was still in effect.

36

The FCC contends its restrained policy applied only to fleeting utterances – specifically, fleeting expletives – and did not extend to fleeting images. But a review of the Commission's enforcement history reveals that its policy on fleeting material was never so limited. The FCC's present distinction between words and images for purposes of determining indecency represents a departure from its prior policy.

Like any agency, the FCC may change its policies without judicial second-guessing. But it cannot change a well-established course of action without supplying notice of and a reasoned explanation for its policy departure. Because the FCC failed to satisfy this requirement, we find its new policy arbitrary and capricious under the Administrative Procedure Act as applied to CBS.

## A.

Section 326 of the Communications Act prohibits the FCC from censoring its licensees' broadcasts.[16] Subject to this constraint, the FCC retains authority to regulate obscene, indecent, or profane broadcast content. *See* 18 U.S.C. § 1464 ("Whoever utters any obscene, indecent, or profane language

_____

[16] *See* 47 U.S.C. § 326 ("Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.").

by means of radio communication shall be fined under this title or imprisoned not more than two years, or both."). Indecency and obscenity are distinct categories of speech. *See FCC v. Pacifica Found.*, 438 U.S. 726, 739-41 (1978) (plurality opinion) ("*Pacifica*"). Indecency, unlike obscenity, is protected by the First Amendment. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). The FCC's authority to restrict indecent broadcast content is nevertheless constitutionally permissible because of the unique nature of the broadcast medium. *Pacifica*, 438 U.S. at 750-51; *see also id.* at 755-56 (Powell, J., concurring).

Congress authorized the FCC to impose forfeiture penalties for violations of 18 U.S.C. § 1464 in 1960.[17] But the FCC did not exercise its authority to find a broadcast statutorily "indecent" until 1975, when it issued a forfeiture penalty against Pacifica Foundation for broadcasting comedian George Carlin's "Filthy Words" monologue. *See In re Citizen's Complaint Against Pacifica Found., Station WBAI(FM), N.Y., N.Y.*, 56 F.C.C.2d 94 (1975). Carlin's monologue, which Pacifica aired on the radio in an early-afternoon time slot, contained extensive and repetitive use of several vulgar expletives over a period of twelve minutes. *See Pacifica*, 438 U.S. at 739.

Pacifica appealed the FCC's forfeiture order to the United States Court of Appeals for the D.C. Circuit. The

---

[17] *See* 47 U.S.C. § 503(b)(1)(D) ("Any person who is determined by the Commission . . . to have . . . violated any provision of section . . . 1464 of title 18 . . . shall be liable to the United States for a forfeiture penalty.").

38

FCC issued a clarification order while Pacifica's appeal was pending, expressly limiting its prior forfeiture order to the specific facts of the Carlin monologue. *In re 'A Petition for Clarification or Reconsideration' of a Citizen's Complaint Against Pacifica Found., Station WBAI(FM), N.Y., N.Y.*, 59 F.C.C.2d 892 (1976) ("*Pacifica Clarification Order*"). Expressly acknowledging the forfeiture order's potential negative impact on broadcast coverage of live events where "there is no opportunity for journalistic editing," the FCC stated its intention to exclude such circumstances from the scope of actionable indecency. *Id*. at ¶ 4 n.1.

Following the *Pacifica Clarification Order*, the D.C. Circuit reversed the FCC's forfeiture order against Pacifica as vague and overbroad and found the agency's indecency regime constituted invalid censorship under 47 U.S.C. § 326. *Pacifica Found. v. FCC*, 556 F.2d 9, 14 (D.C. Cir. 1977). The FCC appealed and the Supreme Court reversed in a narrow plurality opinion. *See Pacifica*, 438 U.S. at 726. The Court rejected Pacifica's statutory argument that the term "indecent" in 18 U.S.C. § 1464 only covered obscene speech. *Pacifica*, 438 U.S. at 739. But the Court confirmed the general validity of the FCC's indecency regime, "emphasiz[ing] the narrowness of [its] holding," which it confined to the facts of the Carlin monologue. *Id*. at 750. Justices Powell and Blackmun concurred in the judgment, writing separately in part to reiterate the narrowness of the decision and to note the Court's holding did not "speak to cases involving the isolated use of a potentially offensive word in the course of a radio broadcast, as distinguished from the verbal shock treatment administered by respondent here." *Id*. at 760-61 (Powell, J., concurring).

Shortly after the Court's ruling in *Pacifica*, a broadcaster's license renewal was challenged on the basis that the broadcaster had aired indecent programming. *See In re Application of WGBH Educ. Found.*, 69 F.C.C.2d 1250 (1978) ("*WGBH*"). Viewer complaints alleged the broadcaster aired several programs containing nudity and other allegedly offensive material. *Id.* at ¶ 2. Distinguishing the facts of *WGBH* from the Court's ruling in *Pacifica*, the FCC rejected the challenge and denied that *Pacifica* afforded it any "general prerogative to intervene in any case where words similar or identical to those in *Pacifica* are broadcast over a licensed radio or television station." *Id.* at ¶ 10. The FCC, noting it "intend[ed] strictly to observe the narrowness of the *Pacifica* holding" and emphasizing the language in Justice Powell's concurring opinion, *id.* at ¶ 10, concluded the single use of an expletive in a program "should not call for us to act under the holding of *Pacifica*." *Id.* at ¶ 10 n.6.

The FCC's restrained enforcement policy continued in the years following *Pacifica*. Rejecting another challenge to a broadcaster's license renewal based on the airing of allegedly indecent material, the FCC reaffirmed that isolated use of expletives in broadcasts did not constitute actionable indecency under 18 U.S.C. § 1464. *See In re Application of Pacifica Found.*, 95 F.C.C.2d 750 (1983). The complaint alleged the broadcaster had on multiple occasions aired programming containing language such as "motherfucker," "fuck," and "shit." *Id.* at ¶ 16. The FCC held these facts did not constitute a prima facie showing of actionable indecency under 18 U.S.C. § 1464, because the complainant had failed to show the broadcasts amounted to "verbal shock treatment" as opposed to "isolated use." *Id.* at ¶ 18.

In April 1987, the FCC issued three simultaneous indecency decisions. *See In re Pacifica Found., Inc.*, 2 F.C.C.R. 2698 (1987); *In re Regents of the Univ. of Cal.*, 2 F.C.C.R. 2703 (1987); *In re Infinity Broad. Corp.*, 2 F.C.C.R. 2705 (1987). These decisions reaffirmed the Commission's restrained enforcement policy and reiterated the agency's policy that isolated or fleeting material would not be considered actionably indecent. *See*, *e.g.*, *Regents of the Univ. of Cal.* at ¶ 3 ("Speech that is indecent must involve more than an isolated use of an offensive word.").

Later in 1987, reconsidering these decisions, the Commission abandoned the view that only the particular "dirty words" used in the Carlin monologue could be indecent.[18] Instead, the FCC explained it would thereafter rely on the broader terms of its generic indecency standard, which defined indecent material as "language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities or organs, when there is a reasonable risk

---

[18] *See In re Infinity Broad. Corp.*, 3 F.C.C.R. 930, ¶ 5 (1987), *vacated in part on other grounds*, *Action for Children's Television v. FCC*, 852 F.2d 1332, 1337 (D.C. Cir. 1988) ("*ACT I*"), *superseded by Action for Children's Television v. FCC*, 58 F.3d 654 (D.C. Cir. 1995) (en banc) ("*ACT II*").

that children may be in the audience." *Id.* at ¶¶ 2, 5.[19] Even so, the FCC affirmed all three decisions on reconsideration, never indicating disagreement with those decisions' express statements that isolated or fleeting material could not be actionably indecent. *Id.*

In 2001, the broadcast industry sought clarification of the policies and rules of the FCC's indecency enforcement regime. Guidance for the industry came in the form of a policy statement issued by the Commission. *See Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding Broadcast Indecency*, 16 F.C.C.R. 7999, ¶ 19 (2001) ("*Industry Guidance*"). The policy statement included multiple examples of FCC rulings as "case comparisons"

---

[19] As described in greater detail *infra*, subsequent litigation determined what time of day broadcasters could reasonably air indecent programming without expecting children to be in the audience. The D.C. Circuit Court of Appeals rejected a total ban on indecency, instructing the FCC to identify a precise time period during which broadcasters could air indecent material. *See ACT I, supra.* In response, the Commission adopted the safe-harbor rule of 47 C.F.R. § 73.3999. After further instruction from the D.C. Circuit in 1995, *ACT II, supra*, the Rule was amended to its current form, which confines enforcement of indecency restrictions to the hours "between 6:00 a.m. and 10:00 p.m." *See* 47 C.F.R. § 73.3999; *In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. § 1464*, 10 F.C.C.R. 10558 (1995).

highlighting the factors that had proved significant in prior indecency determinations. One of the factors noted as leading to prior determinations that a program was not actionably indecent was the "fleeting or isolated" nature of potentially indecent material in the context of the overall broadcast. *See id.* at ¶¶ 17-18.

Soon after the Commission's issuance of the *Industry Guidance* policy statement, its restrained enforcement policy changed. In an unscripted remark during a live NBC broadcast of the Golden Globe Awards on January 19, 2003, musician Bono said "this is really, really fucking brilliant" while accepting an award. *See In re Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program*, 19 F.C.C.R. 4975, ¶ 3 n.4 (2004) ("*Golden Globes*"). Viewers complained to the FCC about Bono's speech, but the Commission's Enforcement Bureau rejected the complaints in part because the utterance was fleeting and isolated and therefore did "not fall within the scope of the Commission's indecency prohibition." *See In re Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program*, 18 F.C.C.R. 19859, ¶ 6 (FCC Enforcement Bureau 2003). The Enforcement Bureau specifically reaffirmed that "fleeting and isolated remarks of this nature do not warrant Commission action." *Id*.

On March 3, 2004, the full Commission reversed the Enforcement Bureau's decision. *See generally Golden Globes*, *supra*. Although the FCC acknowledged the existence of its restrained enforcement policy for isolated or fleeting utterances, it overruled all of its prior cases holding such instances not actionable. *Id*. at ¶ 12 ("While prior

Commission and staff action have indicated that isolated or fleeting broadcasts of the 'F-Word' such as that here are not indecent or would not be acted upon, consistent with our decision today we conclude that any such interpretation is no longer good law."). But the Commission made it clear that licensees could not be held liable for broadcasting fleeting or isolated indecent material prior to its *Golden Globes* decision. *See id.* at ¶ 15 & n.40 (declining to impose a forfeiture penalty because "existing precedent would have permitted [the Golden Globe Awards] broadcast" and therefore it would be "inappropriate" to sanction licensees for conduct prior to notice of policy change).[20]

The FCC's new indecency policy created in *Golden Globes* was soon challenged by the broadcast industry. On February 21, 2006, the Commission issued an omnibus order resolving multiple indecency complaints against television broadcasters in an effort to "provide substantial guidance to broadcasters and the public about the types of programming that are impermissible under our indecency standard." *In re Complaints Regarding Various Television Broadcats Between February 2, 2002 and March 8, 2005*, 21 F.C.C.R. 2664, ¶ 2 (2006) ("*Omnibus Order*"). The *Omnibus Order* found four

---

[20] The Commission also cited *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618 (D.C. Cir. 2000), explaining that the court in *Trinity* "reversed [a] Commission decision that denied a renewal application for abuse of process in connection with the Commission's minority ownership rules because the court found the Commission had not provided sufficiently clear notice of what those rules required." *Golden Globes* at ¶ 15 n.40.

programs indecent and profane: (1) Fox's broadcast of the 2002 Billboard Music Awards, in which performer Cher used an unscripted expletive during her acceptance speech; (2) Fox's broadcast of the 2003 Billboard Music Awards, in which presenter Nicole Richie used two unscripted expletives; (3) ABC's broadcast of various episodes of its NYPD Blue series, in which assorted characters used scripted expletives; and (4) a CBS broadcast of The Early Show, in which a guest used an unscripted expletive during a live interview. *Id.* at ¶¶ 101, 112 n.64, 125, 137. Applying its policy announced in *Golden Globes*, the Commission found the broadcasts indecent despite the fleeting and isolated nature of the offending expletives. *Id.* at ¶¶ 104, 116, 129, 140.

As in *Golden Globes*, the Commission recognized the inequity in retroactively sanctioning the conduct of broadcast licensees. Because the offending broadcasts occurred prior to the issuance of its *Golden Globes* decision, the FCC concluded that existing precedent would have permitted the broadcasts. *Id.* Accordingly, the FCC did not issue forfeiture orders against any of the licensees. *Id.* at ¶¶ 111, 124, 136, 145.

The networks appealed the *Omnibus Order*, and the cases were consolidated before the United States Court of Appeals for the Second Circuit. Granting a request by the FCC, the court remanded the matter to allow the Commission an opportunity to address the petitioners' arguments. After soliciting public comment, the FCC issued a new order on November 6, 2006, reaffirming its indecency findings against Fox for the 2002 and 2003 Billboard Music Awards but reversing its finding against CBS for The Early Show

broadcast and dismissing the complaint against ABC on procedural grounds. *See In re Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005*, 21 F.C.C.R. 13299 (2006) ("*Fox Remand Order*").

The networks' original appeal to the Second Circuit was reinstated on November 8, 2006, and consolidated with a petition for review of the *Fox Remand Order*. *Fox Television Stations, Inc. v. FCC*, 489 F.3d 444, 454 (2d Cir. 2007) ("*Fox*"), *cert. granted*, 76 U.S.L.W. 3490 (U.S. Mar. 17, 2008) (No. 07-582). The court granted motions to intervene by other networks, including CBS, and the networks collectively raised several challenges to the validity of the *Fox Remand Order* essentially mirroring those raised in this case. *See Fox*, 489 F.3d at 454.

Undertaking a thorough review of the history of the FCC's indecency regime similar to that which we engage in here, the Second Circuit found the FCC's "consistent enforcement policy" prior to the *Golden Globes* decision excluded fleeting or isolated expletives from regulation. *Id.* at 455. The court concluded "there is no question" that the FCC changed its policy with respect to fleeting expletives, and that the policy "changed with the issuance of *Golden Globes*." *Id.* (citations omitted). Judge Leval, dissenting in *Fox* for other reasons, agreed with the majority's conclusion that the FCC changed its position on fleeting utterances, although he considered the change of standard "relatively modest." *See id.* at 469 (Leval, J., dissenting); *see also id.* at 470 (Leval, J., dissenting) (stating that the FCC changed its position and finding that the FCC clearly acknowledges that its *Golden Globes* and *Fox Remand Order* rulings were not consistent with its prior standard). We agree that the *Golden*

*Globes* decision represented a policy departure by the FCC. The extensive history detailed above demonstrates a consistent and entrenched policy of excluding fleeting broadcast material from the scope of actionable indecency.

In spite of this history, the FCC contends that by February 1, 2004 (the date of the Halftime Show), a broadcaster in CBS's position should have known that even isolated or fleeting indecent material in programming could be actionable. Despite its announced reversal of prior policy in its *Golden Globes* decision on March 3, 2004, the Commission points to one sentence in its 2001 policy statement to support its position: "[E]ven relatively fleeting references may be found indecent where other factors contribute to a finding of patent offensiveness." *Industry Guidance* at ¶ 19.[21]  But when read in its original context

---

[21] In its 2001 policy statement, the Commission described the "principal factors that have proved significant in [its] decisions to date" as: "(1) the *explicitness or graphic nature* of the description or depiction of sexual or excretory organs or activities; (2) whether the material *dwells on or repeats at length* descriptions of sexual or excretory organs or activities; (3) *whether the material appears to pander or is used to titillate*, or *whether the material appears to have been presented for its shock value*." *Industry Guidance* at ¶ 10 (emphasis in original).  It has since contended that its fleeting material policy was no policy at all, asserting instead that the fleeting nature of material was only a consideration under the second factor and could be outweighed by the other two factors depending on the specific facts of a case.  But as we detail *infra*, this assertion contradicts the history of the

47

rather than as an isolated statement, this sentence does not support the Commission's assertion here. The "relatively fleeting references" identified by that sentence are distinguishable from the truly "fleeting" broadcast material the FCC had included in its fleeting material policy. The paragraph cites, for instance, a notice of apparent liability against WEZB-FM, New Orleans, to exemplify the kind of "relatively fleeting references" the FCC considered actionably indecent. *See id.* (citing *EZ New Orleans, Inc. (WEZB(FM))*, 12 F.C.C.R. 4147 (MMB 1997) ("*WEZB-FM NAL*")). The citation to *WEZB-FM NAL* specifically describes as indecent an "announcer joke" involving incest, forceful sexual contact with children, and a reference to cleaning "blood off [a] diaper." *Id.* The "announcer joke" is distinguishable on its face from "fleeting" material such as a brief glimpse of nudity or isolated use of an expletive. Moreover, the "announcer joke" was merely one incident

---

Commission's indecency enforcement regime and is foreclosed by the agency's admissions in *Golden Globes* and *Fox*, which are controlling here, that its prior policy was to exclude fleeting material from the scope of actionable indecency. Although the FCC disputes the breadth of its policy, now contending the policy was limited only to fleeting expletives or alternatively to fleeting utterances, the fleeting nature of broadcast material was unquestionably treated by the FCC as more than one of several contextual factors subject to balancing.

48

among dozens included in a transcript supporting the forfeiture liability determination in the *WEZB-FM NAL.*[22]

Nevertheless, as it clarified at oral argument, the FCC relies on its 2001 *Industry Guidance* to contend its policy on fleeting or isolated material "was a policy with respect to cases relying solely on the use of expletives." As the Commission explained at oral argument, "[t]here was not a policy that all short utterances were exempt." This reading of the Commission's policy on fleeting material is untenable. Even the FCC's *Industry Guidance* fails to support such a narrow characterization. *See*, *e.g.*, *Industry Guidance* at ¶ 18 (quoting *L.M. Commc'ns of S. C., Inc. (WYBB(FM))*, 7 F.C.C.R. 1595 (MMB 1992), for the proposition that "'a fleeting or isolated utterance . . . , within the context of live and spontaneous programming, does not warrant a Commission sanction.'").

Accordingly, we find the Commission's unsubstantiated contentions in this regard contradict the

---

[22] The *WEZB-FM NAL* found a broadcast licensee apparently liable for a forfeiture penalty of $12,000 for its broadcast of indecent material during six radio broadcasts spanning fourteen hours of airtime over nearly a one year period. The *WEZB-FM NAL* provides transcript excerpts from these broadcasts, which involved very graphic segments discussing a variety of sexual topics in extended detail. The "announcer joke" included in the FCC's *Industry Guidance* was merely one of these factual predicates for the broadcast licensee's forfeiture liability for indecency.

lengthy history of the Commission's restrained enforcement policy. While "an agency's interpretation of its own precedent is entitled to deference," *Cassel v. FCC*, 154 F.3d 478, 483 (D.C. Cir. 1998), deference is inappropriate where the agency's proffered interpretation is capricious. Until its *Golden Globes* decision in March of 2004, the FCC's policy was to exempt fleeting or isolated material from the scope of actionable indecency. Because CBS broadcasted the Halftime Show prior to *Golden Globes*, this was the policy in effect when the incident with Jackson and Timberlake occurred.

**B.**

If the FCC's restrained enforcement policy for fleeting broadcast material was intact until the *Golden Globes* decision in March of 2004, our inquiry would end with a simple examination of the chronology of the FCC's actions. CBS broadcasted the Halftime Show more than a month prior to *Golden Globes*. The Commission's orders here would amount to a retroactive application of the new policy it announced in *Golden Globes,* which would raise due process concerns. The Commission has recognized the inequity in such an outcome. *See Omnibus Order*, *supra*, at ¶¶ 111, 124, 136, 145 (declining to issue forfeiture orders because the offending broadcasts occurred prior to the issuance of its *Golden Globes* decision, and therefore "existing precedent would have permitted [the] broadcasts"); *see also Trinity Broad. of Fla., Inc.*, 211 F.3d at 628 ("Because '[d]ue process requires that parties receive fair notice before being deprived of property,' we have repeatedly held that '[i]n the absence of notice–for example, where the regulation is not sufficiently clear to warn a party about what is expected of it–an agency

50

may not deprive a party of property by imposing civil or criminal liability.'" (citation omitted)).

But the FCC urges another reading of *Golden Globes*, perhaps less obvious yet still plausible, which interprets *Golden Globes* as addressing only the broadcast of fleeting expletives, not other fleeting material such as brief images of nudity. Further, the Commission contends its fleeting material policy, as initially adopted, was limited to fleeting words and did not extend to fleeting images. Under this view, *Golden Globes* would be inapposite here – the Commission's sanction against CBS would be in line with its treatment of images as part of its historical indecency enforcement regime. If, as the FCC contends, *Golden Globes* was limited to fleeting expletives, then its orders issuing forfeiture penalties in this case did not constitute a retroactive application of the policy change in *Golden Globes*.

But even if we accept the FCC's interpretation of *Golden Globes* and read it as only addressing fleeting expletives, the Commission's view of the scope of its fleeting materials policy prior to *Golden Globes* is unsustainable. As we will explain, the Commission – before *Golden Globes* – had not distinguished between categories of broadcast material such as images and words. Accordingly, even if, as the FCC contends, *Golden Globes* only addressed expletives, it nevertheless represented the first time the Commission distinguished between formats of broadcast material or singled out any one category of material for special treatment under its fleeting material policy. That is, it altered the scope of the FCC's fleeting material policy by excising only one category of fleeting material – fleeting expletives – from the policy. And it therefore did not constitute an abdication of its

51

fleeting material policy. Rather, a residual policy on other categories of fleeting material – including all broadcast content other than expletives – remained in effect.

Accordingly, subsequent agency action was required to change the fleeting material policy as it applied to broadcast content other than expletives. By targeting another category of fleeting material – fleeting images – in its orders against CBS in this case, the FCC apparently sought to further narrow or eliminate the fleeting material policy as it existed following *Golden Globes*. The Commission's determination that CBS's broadcast of a nine-sixteenths of one second glimpse of a bare female breast was actionably indecent evidenced the agency's departure from its prior policy. Its orders constituted the announcement of a policy change – that fleeting images would no longer be excluded from the scope of actionable indecency.

The question is whether the FCC's departure from its prior policy is valid and enforceable as applied to CBS. As noted, agencies are free to change their rules and policies without judicial second-guessing. *See*, *e.g.*, *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 863 (1984). But an agency cannot ignore a substantial diversion from its prior policies. *See Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) (agency must "provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"). As the Supreme Court explained in *State Farm*, an agency must be afforded great latitude to change its policies, but it must justify its actions by articulating a reasoned analysis behind the change:

Petitioner . . . contend[s] that the rescission of an agency rule should be judged by the same standard a court would use to judge an agency's refusal to promulgate a rule in the first place–a standard Petitioner believes considerably narrower than the traditional arbitrary and capricious test and "close to the borderline of nonreviewability." We reject this view. . . . Petitioner's view would render meaningless Congress' authorization for judicial review of orders revoking . . . rules. Moreover, the revocation of an extant regulation is substantially different than a failure to act. Revocation constitutes a reversal of the agency's former views as to the proper course. A "settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to." Accordingly, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."

463 U.S. at 42-43 (citations omitted).

The agency's obligation to supply a reasoned analysis for a policy departure requires an affirmative showing on record. It "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational

53

connection between the facts found and the choice made.'" *Id*. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). A reviewing court "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id*. (citations omitted). The agency's actions will then be set aside as "arbitrary and capricious" if the agency failed to provide a "reasoned explanation" for its decision to change course. *Massachusetts v. EPA*, — U.S. — , 127 S.Ct. 1438, 1463 (2007); *see State Farm*, 463 U.S. at 42-43; *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("unexplained inconsistency" in agency practice is a reason for holding a policy reversal "arbitrary and capricious" under the APA, unless "the agency adequately explains the reasons for a reversal of policy").

In *Fox*, the Second Circuit analyzed the FCC's changed policy on fleeting expletives under *State Farm*,[23] but

---

[23] It was undisputed that the FCC changed its policy on fleeting expletives in *Golden Globes*, which was decided prior to *Fox*. But as the *Fox* court explained, the actual moment the agency changed its course was not pertinent in determining whether the change was valid under *State Farm*:

> [W]e . . . reject the FCC's contention that our review here is narrowly confined to the specific question of whether the two Fox broadcasts . . . were indecent. The [*Fox Remand Order*] applies the policy announced in *Golden Globes*. If that policy is invalid, then we cannot sustain

the panel split on the outcome of its analysis. Judge Pooler, writing for the majority, found the policy change arbitrary and capricious because the FCC failed to provide a reasoned explanation for the change. *Fox*, 489 F.3d at 455 ("The Networks contend that the Remand Order is arbitrary and capricious because the FCC has made a 180-degree turn regarding its treatment of 'fleeting expletives' without providing a reasoned explanation justifying the about-face. We agree."). Scrutinizing the sufficiency of the Commission's explanation for its policy change, the court rejected the agency's proffered rationale as "disconnected from the actual policy implemented by the Commission." *Id.* at 459 n.8 (citation omitted).

Judge Leval, writing in dissent, also applied *State Farm*, but he disagreed with the amount of deference the majority afforded the FCC's policy decision. Although he

> the indecency findings against Fox. Thus, as the Commission conceded during oral argument, the validity of the new "fleeting expletive" policy announced in *Golden Globes* and applied in the [*Fox Remand Order*] is a question properly before us on this petition for review.

*Fox*, 489 F.3d at 454. To hold otherwise would create a situation ripe for manipulation by an agency. *Cf. ACT I*, *supra*, 852 F.2d at 1337 ("[A]n agency may not resort to [ad hoc] adjudication as a means of insulating a generic standard from judicial review.").

55

agreed that the FCC was obligated to provide a reasoned explanation for its policy shift, he found the agency's explanation sufficient. As Judge Leval explained:

> In my view, in changing its position on the repetition of an expletive, the Commission complied with these requirements. It made clear acknowledgment that its *Golden Globes* and *Remand Order* rulings were not consistent with its prior standard regarding lack of repetition. It announced the adoption of a new standard. And it furnished a reasoned explanation for the change. Although one can reasonably disagree with the Commission's new position, its explanation . . . is not irrational, arbitrary, or capricious. The Commission thus satisfied the standards of the Administrative Procedure[] Act.

*Id.* at 470 (Leval, J., dissenting).

In this case, *State Farm* also provides the correct standard of review, but we need not engage in the substantive inquiry that divided the Second Circuit panel in *Fox*. There, as Judge Leval noted in dissent, the FCC provided an explanation for changing its policy on fleeting expletives. The critical question splitting the court was whether that explanation was adequate under *State Farm*. Here, unlike in *Fox*, the FCC has not offered any explanation – reasoned or otherwise – for changing its policy on fleeting images. Rather, the FCC asserts it never had a policy of excluding fleeting images from the scope of actionable indecency, and therefore no policy change occurred when it determined that

the Halftime Show's fleeting image of Janet Jackson's breast was actionably indecent. Accordingly, we must determine whether the FCC's characterization of its policy history is accurate. If it is not, then the FCC's policy change must be set aside as arbitrary and capricious, because it has failed to even acknowledge its departure from its former policy let alone supply a "reasoned explanation" for the change as required by *State Farm*.

CBS contends the FCC's indecency regime treated words and images alike, so the exception for fleeting material applied with equal force to words and images. The Commission rejects this assertion, contending its prior policy on fleeting material was limited to words alone. Although the FCC acknowledges it had never explicitly distinguished between images and words for the purpose of defining the scope of actionable indecency, it contends the existence of such a distinction was obvious, even if unstated.[24]

---

[24] The FCC's position is difficult to reconcile with the source of its authority to regulate broadcast content. The text of 18 U.S.C. § 1464 provides: "Whoever *utters* any obscene, indecent, or profane *language* by means of radio communication shall be fined under this title or imprisoned not more than two years, or both." *Id*. (emphasis added). Although the text on its face only reaches spoken words, it is applied broadly, as here, to reach all varieties of indecent content. But this broad interpretation of the text requires that the FCC treat words and images interchangeably in order to fit its regulation of indecent images within the boundaries of its statutory authority. Where the FCC's entire enforcement regime is built on the agency's treatment of words and images

The Commission's conclusion on the nature and scope of its indecency regime – including its fleeting material policy – is at odds with the history of its actions in regulating indecent broadcasts. In the nearly three decades between the Supreme Court's ruling in *Pacifica* and CBS's broadcast of the Halftime Show, the FCC had never varied its approach to indecency regulation based on the format of broadcasted content. Instead, the FCC consistently applied identical standards and engaged in identical analyses when reviewing complaints of potential indecency whether the complaints were based on words or images.

In 2000, for example, the FCC rejected a complaint of indecency based on scenes of nudity in a television broadcast of the film "Schindler's List." *In re WPBN/WTOM License Subsidiary, Inc.*, 15 F.C.C.R. 1838 (2000). Finding the broadcasted images not actionably indecent, the FCC noted "nudity itself is not *per se* indecent" and applied the identical indecency test the agency used to review potentially indecent language. *Id.* at ¶ 11. The Commission did not treat the nudity complaint differently – factually or legally – from a complaint for indecency based on a spoken utterance. *See id.* at ¶ 10 n.5 ("The Supreme Court has observed that contextual assessments may involve (and are not limited to) an

as functionally identical, it is unclear how the difference between words and images is "obvious." At minimum, the FCC cannot reasonably expect the difference between words and images to be so self-evident that broadcast licensees seeking to comply with indecency standards would interpret FCC enforcement orders narrowly based on whether the reviewed content consisted of words or images.

58

examination of whether the actual *words or depictions* in context are, for example, vulgar or shocking, a review of the manner in which the *words or depictions* are portrayed, and an analysis of whether the allegedly *indecent material is isolated or fleeting*." (emphasis added)). The Commission even referred in a footnote to its policy towards fleeting material, never suggesting the policy would be inapplicable because the offending broadcast content was an image rather than a word. *See id.* at ¶ 5 n.10 (explaining that contextual assessments of whether certain programming is patently offensive, and therefore actionably indecent, "may involve . . . analysis of whether the allegedly indecent material is isolated or fleeting").

     The Commission took the same approach when reviewing viewer complaints against a television station for multiple broadcasts of programs containing expletives, nudity, and other allegedly indecent material. *See WGBH*, *supra*.[25] Categorically denying that the programming in

---

[25] Among several broadcasts at issue in *WGBH* were: (1) "numerous episodes of *Monty Python's Flying Circus*, which allegedly consistently relie[d] primarily on scatology, immodesty, vulgarity, nudity, profanity and sacrilege for humor"; (2) "a program entitled *Rock Follies* . . . which [the petitioner] describe[d] as vulgar and as containing profanity" including "obscenities such as shit, bullshit, etc., and action indicating some sexually-oriented content in the program"; and (3) "other programs which allegedly contained nudity and/or sexually-oriented material." 69 F.C.C.R. 1250 at ¶ 2 (internal quotation marks omitted).

*WGBH* was actionably indecent,[26] the FCC distinguished the facts of *WGBH* from the Carlin monologue in *Pacifica* by invoking its restrained enforcement policy for fleeting or isolated material. *See id.* at ¶ 10 ("We intend strictly to observe the narrowness of the *Pacifica* holding. . . . Justice Powell's concurring opinion . . . specifically distinguished 'the verbal shock treatment [in *Pacifica*]' from 'the isolated use of a potentially offensive word in the course of a radio broadcast.' . . . In the case before us, petitioner has made no comparable showing of abuse by WGBH-TV of its programming discretion."); *id.* at ¶ 10 n.6 (finding that WGBH-TV's programs "differ[ed] dramatically from the concentrated and repeated assault involved in *Pacifica*"). In its indecency analysis in *WGBH*, the FCC made no distinction between words and images (nudity or otherwise).

As evidence that the FCC's policy on fleeting material, as it existed at the time of the Halftime Show, did not

---

[26] The FCC contends *WGBH* is inapposite because it was a license revocation proceeding rather than a direct complaint for indecency. But its analysis in reaching its decision is instructive. Because the complainant in *WGBH* challenged the broadcaster's license based on a pattern of allegedly indecent broadcasts, the Commission expressly answered the threshold question of whether the broadcasts were indecent. Separate from the question of whether the broadcaster's actions were sufficient to revoke its license, the Commission's analysis illustrates that "words" and "depictions" were treated identically for purposes of determining whether a broadcast was actionably indecent.

distinguish between words and images, CBS presented several complaints viewers had submitted to the FCC about allegedly indecent broadcasts. CBS Letter Br., *submitted pursuant to* Fed R. App. P. 28(j) (Aug. 13, 2007). Accompanying each complaint is a corresponding reply letter by the FCC rejecting the indecency allegation. Each complaint involves some variety of sexually explicit imagery. One letter, for example, describes the early-evening broadcast of a female adult dancer at a strip club and alleges the broadcast contained visible scenes of the woman nude from the waist down revealing exposed buttocks and "complete genital nudity" for approximately five to seven seconds. Another letter describes in part a Sunday-morning television broadcast of the movie "Devices and Desires," which included "scenes of a topless woman in bed with her lover, with her breast very clearly exposed, several scenes of a topless woman running on the beach, and several scenes of a nude female corpse, with the breasts clearly exposed."

Citing *Pacifica* and the indecency standard used to review the broadcast of potentially indecent language, the FCC summarily rejected each of these complaints as "not actionably indecent." The FCC contends these "form letters" are irrelevant, as the letters "do not even explain the grounds for the staff's conclusions that the broadcasts were not indecent, much less rely on the 'fleeting' nature of any alleged nudity as a reason for rejecting the complaints." FCC Letter Br., *submitted pursuant to* Fed R. App. P. 28(j) (Aug. 27, 2007). But the relevance of the FCC's rejection letters is not found in their specific reasons for finding the images not actionably indecent. Rather, the rejection letters illustrate that the FCC used the identical form letters and indecency

61

analyses to address complaints of indecent nudity that it had long used to address complaints of indecent language.

Confronted with this history of FCC enforcement of restrictions on broadcast indecency, the entirety of which reveals no distinction in treatment of potentially indecent images versus words, the FCC nevertheless finds such a distinction evident in its prior decisions. *See*, *e.g.*, FCC Br. at 26-27. To support this view, the FCC offers its Notice of Apparent Liability for Forfeiture in *In re Young Broadcasting of San Francisco, Inc.*, 19 F.C.C.R. 1751 (2004), issued four days before CBS's broadcast of the Halftime Show. *See Reconsideration Order* at ¶¶ 10, 36; FCC Br. at 26-27. *Young Broadcasting* involved a morning news show segment in which two performers from a production titled "Puppetry of the Penis" appeared in capes but were otherwise naked underneath the capes. *Young Broadcasting* at ¶ 13. The two men, whose act involved manipulating and stretching their genitalia to simulate various objects, performed a demonstration of their act with the agreement of the show's hosts and at the urging of off-camera station personnel. *Id*. Although the performance was directed away from the camera, the penis of one performer was fully exposed on camera for less than one second as the men turned away to act out their performance. *See id*. at ¶¶ 12, 13. Based on these facts, the Commission found the station apparently liable for a forfeiture penalty for broadcasting indecent material. *Id*. at ¶ 16.

The FCC contends *Young Broadcasting* was not a departure from its prior indecency regime. Rather, as it explains, *Young Broadcasting* merely represented the first instance in which the Commission expressly articulated its

pre-existing (but unstated) policy of treating fleeting images differently from fleeting words.[27] On this view, according to the FCC, *Young Broadcasting* should have dispelled any doubts about the historical breadth of its fleeting material policy prior to the Halftime Show because it was issued a few days before CBS's broadcast. But *Young Broadcasting* is unavailing for this purpose. It makes no distinction, express or implied, between words and images in reaching its indecency determination. To the contrary, it discusses and compares several other FCC determinations on potentially indecent utterances and depictions, treating the cases interchangeably and ultimately distinguishing those cases' outcomes without any indication that the format of the

---

[27] Several statements in the FCC's own press release announcing the *Young Broadcasting* Notice of Apparent Liability belie the agency's contention here that *Young Broadcasting* accorded with its prior policies. *See* Press Release, FCC, *Comm'n Proposes to Fine Young Broadcasting of San Francisco, Inc., Statutory Maximum for Apparent Violation of Indecency Rules* (Jan. 27, 2004) (statement of Chairman Michael K. Powell: "Today, we open another front in our increased efforts to curb indecency on our nation's airwaves . . . ."); *id.* (statement of Commissioner Michael J. Copps: "I am pleased that this Commission is finally taking an initial step against indecency on television."); *id.* (statement of Commissioner Kevin J. Martin: "I hope that this step today represents the beginning of a commitment to consider each indecency complaint seriously . . . .").

offending material was a relevant consideration. *See, e.g.*, *id.* at ¶ 12 & n.35; *id.* at ¶ 14.[28]

Accordingly, *Young Broadcasting* does not support the FCC's assertion here that its policy on fleeting material had always excluded images and applied only to words. *Young Broadcasting* appears instead to be best understood as the

---

[28] One of the cases the FCC distinguished in *Young Broadcasting* was its Notice of Apparent Liability in *Flambo Broadcasting, Inc. (KFMH-FM)*, 9 F.C.C.R. 1681 (MMB 1994), which involved "a radio station's broadcast of sexual material in a crude joke" that was not found actionably indecent. *Young Broadcasting* at ¶ 12 n.35. As with the other cases it discussed in its *Young Broadcasting* Notice of Apparent Liability, the FCC did not draw any distinction between *Young Broadcasting* and *Flambo Broadcasting* based on the subject material there being words or images. But it did distinguish the two notices of apparent liability in part because: "assuming that the joke [at issue in *Flambo Broadcasting*] was cut off immediately, the staff of the then-Mass Media Bureau found that it would not have been actionably indecent because it was *brief, live, unscripted and from an outside source*." *Young Broadcasting* at ¶ 12 n.35 (emphasis added). Notably, the facts here – a brief image of a bare female breast during the live Halftime Show broadcast resulting from an unscripted stunt by Jackson and Timberlake – are remarkably similar to the *Flambo Broadcasting* fact pattern that the FCC found readily distinguishable from the actionably indecent material in *Young Broadcasting*.

Commission's initial effort to abandon its restrained enforcement policy on fleeting material. While the final disposition of *Young Broadcasting* was still unresolved,[29] the overarching policy departure that the Commission sought to accomplish there was effectuated by a combination of its *Golden Globes* order and its orders on appeal here. The Commission's reasoning in *Young Broadcasting* is therefore illuminating here.

---

[29] *Young Broadcasting* was a notice of apparent liability, which is non-final until the implicated licensee either declines to dispute the findings in the notice or the licensee's responsive opposition is fully adjudicated. *See* FCC Br. at 13 (describing content of CBS Notice of Apparent Liability as "tentative conclusions")*; see also* 47 U.S.C. § 504(c) ("In any case where the Commission issues a notice of apparent liability looking toward the imposition of a forfeiture under this chapter, that fact shall not be used, in any other proceeding before the Commission, to the prejudice of the person to whom such notice was issued, unless (i) the forfeiture has been paid, or (ii) a court of competent jurisdiction has ordered payment of such forfeiture, and such order has become final."). At the time the Commission issued its *Reconsideration Order* against CBS and after its determination in *Golden Globes*, the question of whether the broadcast licensee in *Young Broadcasting* would contest the Notice of Apparent Liability in that case was still unresolved. *See Reconsideration Order* at ¶ 6 n. 25 (indicating the status of the *Young Broadcasting* Notice of Apparent Liability as "response pending" at the time of the *Reconsideration Order*'s issuance).

In *Young Broadcasting*, the Commission distinguished that case's facts from several of its prior orders. But in so doing, the Commission overlooked the fact that application of its fleeting material policy had been a determinative factor in those prior orders. For example, the licensee in *Young Broadcasting* cited for support *L.M. Communications*, 7 F.C.C.R. 1595 (1992), in which the radio broadcast of a single expletive was found not actionably indecent. *Young Broadcasting* at ¶ 12 n.35. The FCC found *L.M. Communications* "distinguishable because there was no finding that the material, in context, was pandering, titillating or intended to shock the audience." *Id.* But *L.M. Communications* made no reference to the pandering, titillating or shocking nature of the subject broadcast material. Rather, it determined the material was not actionably indecent because the "broadcast contained only a fleeting and isolated utterance which, within the context of live and spontaneous programming, does not warrant a Commission sanction." *L.M. Commc'ns*, 7 F.C.C.R. at 1595.

The Commission's failure to acknowledge the existence of its prior policy on fleeting material in *Young Broadcasting* is illustrative of its approach here. In *Young Broadcasting*, it read the policy out of existence by substituting new rationales for its prior indecency determinations that had applied the policy. Here, the Commission is foreclosed from adopting the same approach by its admission in *Golden Globes* that the fleeting material policy existed. So it instead apparently seeks to revise the scope of the policy by contending the policy never included fleeting images. But extensive precedent over thirty years of indecency enforcement demonstrates otherwise.

Our reluctant conclusion that the FCC has advanced strained arguments to avoid the implications of its own fleeting indecency policy was echoed by our sister circuit in *Fox*:

> In [its *Omnibus Order*], the FCC "reject[s] Fox's suggestion that Nicole Richie's [use of two expletives] would not have been actionably indecent prior to our *Golden Globes* decision," and would only concede that it was "not apparent" that Cher's [use of one expletive] at the 2002 Billboard Music Awards would have been actionably indecent at the time it was broadcast. [*Id.*] at ¶¶ 22, 60. Decisions expressly overruled in *Golden Globes* were now dismissed as "staff letters and dicta," and the Commission even implied that the issue of fleeting expletives was one of first impression for the FCC in *Golden Globes*. *Id.* at ¶ 21 ("[I]n 2004, the Commission itself considered for the first time in an enforcement action whether a single use of an expletive could be considered indecent.").

*Fox*, 489 F.3d at 456 n.6. When confronted with these troublesome revisionist arguments, the FCC conceded the existence of its prior policy. *See id.* at 456 ("[I]n its brief to this court, the FCC now concedes that *Golden Globes* changed the landscape with regard to fleeting expletives." (citations omitted)); *see also id.* at 470 (Leval, J., dissenting) ("[The FCC] made clear acknowledgment that its *Golden Globes* and *Remand Order* rulings were not consistent with its prior standard regarding lack of repetition."). But it has

made no such concession here. Faced with extensive evidence to the contrary, the Commission nevertheless continues to assert that its fleeting material policy was limited to words and did not exclude fleeting images from the scope of actionable indecency.

In sum, the balance of the evidence weighs heavily against the FCC's contention that its restrained enforcement policy for fleeting material extended only to fleeting words and not to fleeting images. As detailed, the Commission's entire regulatory scheme treated broadcasted images and words interchangeably for purposes of determining indecency. Therefore, it follows that the Commission's exception for fleeting material under that regulatory scheme likewise treated images and words alike. Three decades of FCC action support this conclusion. Accordingly, we find the FCC's conclusion on this issue, even as an interpretation of its own policies and precedent, "counter to the evidence before the agency" and "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

Because the Commission fails to acknowledge that it has changed its policy on fleeting material, it is unable to comply with the requirement under *State Farm* that an agency supply a reasoned explanation for its departure from prior policy.[19] *See id*.; *cf. Ramaprakash*, 346 F.3d at 1125

---

[19] In its brief and at oral argument, the Commission continues to assert it has not changed its policy on fleeting material, yet it also suggests several reasons why a policy including fleeting images within the scope of actionable indecency is reasonable. *But see State Farm*, 463 U.S. at 50

("[F]ailure to come to grips with conflicting precedent constitutes an [agency's] inexcusable departure from the essential requirement of reasoned decision making."); *LeMoyne-Owen College v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (Roberts, J.) ("[W]here, as here, a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument. . . . The need for an explanation is particularly acute when an agency is applying a multi-factor test through case-by-case adjudication."). Consequently, the FCC's new policy of including fleeting images within the scope of actionable indecency is arbitrary and capricious under *State Farm* and the Administrative Procedure Act, and therefore invalid as applied to CBS.

## IV.

In finding CBS liable for a forfeiture penalty, the FCC arbitrarily and capriciously departed from its prior policy excepting fleeting broadcast material from the scope of actionable indecency. Therefore, we will grant CBS's petition for review and will vacate the Commission's order in its entirety.

---

("[T]he courts may not accept appellate counsel's post hoc rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." (internal citations omitted)).

*CBS v. FCC*, No. 06-3575

SCIRICA, *Circuit Judge*, Dissenting

This case comes to us on remand from the Supreme Court of the United States. CBS petitions for review of orders by the Federal Communications Commission imposing a monetary forfeiture under 47 U.S.C. § 503(b) for the broadcast of "indecent" material in violation of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. I believe the Supreme Court's intervening opinion in *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800 (2009), undermines the basis of our prior holding on the Administrative Procedure Act.[1] Accordingly, I respectfully dissent and would hold the FCC's imposition of a civil forfeiture here is neither arbitrary nor capricious. Furthermore, I would hold precedent requires we remand to the FCC for it to apply the proper standard for ordering a civil forfeiture for the broadcast of indecent material.

The alleged indecency occurred during the Halftime Show of Super Bowl XXXVIII, broadcast live by CBS on February 1, 2004. The Show's finale involved a routine by Janet Jackson and Justin Timberlake. In an unscripted moment at the end of the performance, Timberlake tore away part of Jackson's bustier, exposing her bare right breast to the camera. The image was broadcast over public airwaves for nine-sixteenths of one second.

At issue is the responsibility of television broadcasters for the transmission of unscripted "indecent" material during

---

[1] My colleagues incorporate portions of our earlier decision in Part B of their opinion. Since I believe *Fox* requires a different result, I would omit our prior opinion.

1

live, contemporaneous television shows. Broadcast television (as opposed to transmissions over cable, satellite, or internet) is subject to greater oversight because the finite number of broadcast frequencies are allocated among competing applicants. *See Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 376 (1969) ("Without government control, the medium would be of little use because of the cacophony of competing voices, none of which could be clearly and predictably heard."); *cf. FCC v. Pacifica Found.*, 438 U.S. 726, 748 (1978) ("[O]f all forms of communication, it is broadcasting that has received the most limited First Amendment protection."). The "scarcity doctrine"—the idea that limited broadcast spectrum and practical factors make television broadcasting unique among media—"has required some adjustment in First Amendment analysis." *FCC v. League of Women Voters*, 468 U.S. 364, 376-77 (1984).[2]

---

[2] CBS and others have questioned whether broadcasting continues to be a unique medium. The Court, however, has so far declined to abandon the scarcity doctrine without the support of Congress or the FCC. *See League of Women Voters*, 468 U.S. at 376 n.11 ("The prevailing rationale for broadcast regulation based on spectrum scarcity has come under increasing criticism . . . . We are not prepared, however, to reconsider our longstanding approach without some signal from Congress or the FCC that technological developments have advanced so far that some revision of the system of broadcast regulation may be required."); *see also* Petition for Writ of Certiorari at 2-8, *FCC v. Fox Television Stations, Inc.*, 131 S. Ct. 3065 (2011) (No. 10-1293), 2011 WL 1540430 at *2-8 (providing the Solicitor General's view on the development of indecency policy and the unique position of broadcast television).

In our earlier decision, we invalidated the FCC's determination that CBS's broadcast of a fleeting image of nudity was actionably indecent. Examining the history of the FCC's enforcement of the indecency standard, we concluded the FCC's policy had been to treat unscripted fleeting material as *per se* exempt from regulation. Because we believed the FCC's forfeiture orders against CBS constituted an unacknowledged change in policy, we held they violated the Administrative Procedure Act's (APA) prohibition on arbitrary and capricious agency action. *See* 5 U.S.C. § 706(2)(A). Furthermore, even assuming the fleeting image of nudity was actionably indecent, we concluded CBS could not be held liable for the broadcast unless it acted with scienter, and it was unclear whether the FCC had applied the proper standard. Accordingly, we vacated the FCC's orders and remanded to allow the FCC an opportunity to reconsider its indecency standard and the *mens rea* for broadcaster liability.

The FCC filed a petition for certiorari. While that petition was pending, the Supreme Court decided *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800 (2009). The question presented in *Fox* was whether the FCC had violated the APA in issuing orders holding Fox liable for isolated expletives broadcast during the 2002 and 2003 Billboard Music Awards. The Court held the FCC had adequately explained its decision such that its orders were neither arbitrary nor capricious under the APA. Soon after deciding *Fox,* the Court granted the FCC's petition for certiorari in this case, vacated our judgment, and remanded for us to reconsider the case in light of *Fox*. *FCC v. CBS Corp.*, 129 S. Ct. 2176 (2009).

In *Fox*, unlike here, the FCC acknowledged it was departing from precedent. Nevertheless, I believe the Court's

intervening decision in *Fox* requires us to revise our prior APA holding. Based on the Supreme Court's account of the history of the FCC's enforcement policy, we cannot adhere to our earlier determination that prior FCC policy had granted a *per se* exemption to all fleeting indecent material; instead, *Fox* compels the conclusion that the fleeting exemption was limited to a particular type of words. Accordingly, under *Fox*, I cannot say the orders in this case represented a change in agency policy, and I would hold the FCC's indecency finding passes muster under the APA. The FCC, however, cannot impose a forfeiture penalty unless CBS acted with the requisite scienter. Because I believe the FCC's forfeiture orders rested on the wrong statutory provision, and misapprehended the proper *mens rea* standard, I would vacate the orders and remand for further proceedings.

## I.

### A.

Our previous opinion set forth the relevant facts:

On February 1, 2004, CBS presented a live broadcast of the national Football League's Super Bowl XXXVIII, which included a halftime show produced by MTV Networks. Nearly 90 million viewers watched the Halftime Show, which began at 8:30 p.m. Eastern Standard Time and lasted about fifteen minutes. The Halftime Show featured a variety of musical performances by contemporary recording artists, with Janet Jackson as the announced headlining act and Justin Timberlake as a "surprise guest" for the final minutes of the

4

show.

Timberlake was unveiled on stage near the conclusion of the Halftime Show. He and Jackson performed his popular song "Rock Your Body" as the show's finale. Their performance, which the FCC contends involved sexually suggestive choreography, portrayed Timberlake seeking to dance with Jackson, and Jackson alternating between accepting and rejecting his advances. The performance ended with Timberlake singing, "gonna have you naked by the end of this song," and simultaneously tearing away part of Jackson's bustier. CBS had implemented a five-second audio delay to guard against the possibility of indecent language being transmitted on air, but it did not employ similar precautionary technology for video images. As a result, Jackson's bare right breast was exposed on camera for nine-sixteenths of one second.

*CBS Corp. v. FCC*, 535 F.3d 167, 171-72 (3d Cir. 2008) (footnote omitted).

After fielding a large number of complaints from viewers of the Halftime Show, the FCC issued a letter of inquiry to CBS seeking additional information about the broadcast. CBS complied. It also made "a public statement of apology for the incident," stating that "Jackson and Timberlake's wardrobe stunt was unscripted and unauthorized" and "claiming it had no advance notice of any plan by the performers to deviate from the script." *Id.* at 172.

On September 22, 2004, the FCC issued a Notice of

5

Apparent Liability finding that CBS had apparently violated federal law and FCC rules regulating the broadcast of indecency and was apparently liable for a forfeiture penalty of $550,000. CBS submitted its Opposition to the Notice.

On March 15, 2006, the FCC issued a forfeiture order and imposed a penalty of $550,000. *In re Complaints Against Various Television Licensees Concerning Their Feb. 1, 2004 Broad. of the Super Bowl XXXVIII Halftime Show*, 21 FCC Rcd. 2760 (2006) ("*Forfeiture Order*"). Applying the standard set forth in its 2001 policy statement, the FCC found the Halftime Show incident satisfied the two-part test for indecency: (1) "the material must describe or depict sexual or excretory organs or activities," and (2) it must be "*patently offensive* as measured by contemporary community standards for the broadcast medium." *In re Industry Guidance on the Comm'n's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding Broad. Indecency*, 16 FCC Rcd. 7999, 8002, ¶¶ 7–8 (2001) ("*Industry Guidance*"); *see Forfeiture Order*, 21 FCC. Rcd. at 2764–65, ¶ 9. Finding the "broadcast of an exposed female breast" met the first part of the test, the FCC focused most of its analysis on whether the broadcast was "patently offensive." *Forfeiture Order*, 21 FCC Rcd. at 2764–67, ¶¶ 9–14.

The FCC's 2001 policy statement had explained that in determining whether broadcast material is patently offensive, "the *full context* in which the material appeared is critically important." *Industry Guidance*, 16 FCC Rcd. at 8002, ¶ 9. Three factors are of principal significance: "(1) the explicitness or graphic nature of the description or depiction of sexual or excretory organs or activities; (2) whether the material dwells on or repeats at length descriptions of sexual or excretory organs or activities; (3) whether the material

6

appears to pander or is used to titillate, or whether the material appears to have been presented for its shock value." *Id.* at 8003, ¶ 10 (emphasis removed). According to the policy statement, "[n]o single factor generally provides the basis for an indecency finding"; the three factors "must be balanced" to determine whether a given broadcast is patently offensive. *Id.*

Applying these factors in its *Forfeiture Order*, the FCC determined that, "in context and on balance," the Halftime Show material was "patently offensive." 21 FCC Rcd. at 2765, ¶ 10. The FCC conceded the second factor weighed against a finding of indecency because "the image of Jackson's uncovered breast . . . is fleeting." *Id.* at 2766, ¶ 12. It noted, however, that "'even relatively fleeting references may be found indecent where other factors contribute to a finding of patent offensiveness,'" and concluded "[i]n this case, . . . the brevity of the partial nudity is outweighed by the first and third factors of our contextual analysis." *Id.* (quoting *Industry Guidance*, 16 FCC Rcd. at 8009, ¶ 19). In the FCC's view, the image was "graphic and explicit" because "although the camera shot is not a close-up, the nudity is readily discernible[,] . . . Jackson and Timberlake, as the headline performers, are in the center of the screen, and Timberlake's hand motion ripping off Jackson's bustier draws the viewer's attention to her exposed breast." *Id.* at 2765, ¶ 11. The FCC also believed, taken in context, the material appeared to shock, pander to, or titillate the audience:

> The offensive segment in question did not merely show a fleeting glimpse of a woman's breast . . . . Rather, it showed a man tearing off a portion of a woman's clothing to reveal her naked breast during a highly sexualized

7

> performance and while he sang "gonna have you naked by the end of this song."

*Id.* at 2767, ¶ 13. On the strength of these two factors, the FCC found the image actionably indecent.

The *Forfeiture Order* also found that CBS was liable under 47 U.S.C. § 503(b)(1) for Timberlake and Jackson's performance. CBS claimed "it had no advance knowledge that Timberlake planned to tear off part of Jackson's clothing to reveal her breast." *Id.* at 2768, ¶ 17. The FCC did not dispute this contention, but it nonetheless determined CBS was subject to a monetary forfeiture. *Id.* at 2769-74, ¶¶ 18–25.

CBS submitted a Petition for Reconsideration challenging several aspects of the FCC's analysis. In an Order on Reconsideration filed on May 31, 2006, the FCC reaffirmed the $550,000 forfeiture. *In re Complaints Against Various Television Licensees Concerning Their Feb. 1, 2004 Broad. of the Super Bowl XXXVIII Halftime Show*, 21 FCC Rcd. 6653 (2006) ("*Reconsideration Order*"). The Order rejected CBS's constitutional arguments and reiterated the FCC's indecency finding. The *Reconsideration Order* revised the FCC's approach for determining CBS's liability under § 503(b)(1). According to the Order, there were three independent bases for CBS's liability. First, despite the fact the network "was acutely aware of the risk of unscripted indecent material in [the Halftime Show]," it "consciously and deliberately failed to take reasonable precautions to ensure that no actionably indecent material was broadcast." *Reconsideration Order*, 21 FCC Rcd. at 6660, ¶ 17; *accord id.* at 6662, ¶ 23 (stating that the FCC's "finding of willfulness is based on CBS's knowledge of the risks and its

8

conscious and deliberate omissions of the acts necessary to address them"). Second, the FCC found Jackson and Timberlake performed as employees of CBS, not independent contractors. Accordingly, CBS was vicariously liable for their actions under the doctrine of *respondeat superior*. *Id.* at 6662-64, ¶¶ 24–28. Third, even if Timberlake and Jackson were independent contractors, CBS would still be liable for their actions in the FCC's view because of "the nondelegable nature of broadcast licensees' responsibility for their programming." *Id.* at 6662, ¶ 23. For these reasons, the FCC refused to rescind or reduce its forfeiture penalty.

**B.**

CBS timely filed a petition for review of the *Reconsideration Order* on July 28, 2006. In our previous opinion, we agreed with CBS that the order's indecency finding violated the APA. *CBS*, 535 F.3d at 175. We acknowledged that "[t]he scope of review under the [APA's] 'arbitrary and capricious' standard is 'narrow, and a court is not to substitute its judgment for that of the agency,'" and that "[l]ike any agency, the FCC may change its policies without judicial second-guessing." *Id.* at 174–75 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). But we noted the FCC "cannot change a well-established course of action without supplying notice of and a reasoned explanation for its policy departure." *Id.* at 175.

We concluded the FCC violated that principle here by failing to acknowledge or explain a departure from "a consistent and entrenched policy of excluding fleeting broadcast material from the scope of actionable indecency." *Id.* at 179. In our view, it was not until its *Golden Globes*

9

decision, issued more than a month after the Halftime Show, that the agency expressly "overruled all of its prior cases holding [isolated or fleeting material] not actionable." *Id.* at 178; *see In re Complaints Against Various Broad. Licensees Regarding Their Airing of the "Golden Globe Awards" Program*, 19 FCC Rcd. 4975, 4980, ¶ 12 (2004) ("*Golden Globes*") ("While prior Commission and staff action had indicated that isolated or fleeting broadcasts of the 'F-Word' such as that here are not indecent or would not be acted upon, consistent with our decision today we conclude that any such interpretation is no longer good law."). Before this date, we believed, "the FCC's policy was to exempt fleeting or isolated material" from indecency regulation. *CBS*, 535 F.3d at 180. "Because CBS broadcasted the Halftime Show prior to *Golden Globes*, this was the policy in effect when the incident with Jackson and Timberlake occurred." *Id.* Accordingly, by finding the fleeting image here to be actionably indecent, the FCC's orders in this case broke with agency policy. And since these orders failed to acknowledge the existence of that policy, we determined they were "unable to comply with the [APA's] requirement . . . that an agency supply a reasoned explanation for its departure" from its prior policy. *Id.* at 188.

As this account suggests, our construction of the FCC's enforcement history played a decisive role in our previous opinion. That opinion recounted this history in detail, *see id.* at 175–89, but a synopsis is necessary here in order to make clear the significance of the Supreme Court's decision in *Fox*. The FCC's indecency policy had its genesis in 1975, when the FCC issued a forfeiture penalty against Pacifica Foundation for broadcasting comedian George

Carlin's "Filthy Words" monologue.[3]  *See In re Citizen's Complaint Against Pacifica Found., Station WBAI(FM), New York, N.Y.,* 56 F.C.C. 2d 94 (1975).  "Carlin's monologue, which Pacifica aired in an early-afternoon time slot, contained extensive and repetitive use of several vulgar expletives over a period of twelve minutes."  *CBS*, 535 F.3d at 175 (citing *Pacifica*, 438 U.S. at 739).  While Pacifica's appeal was pending before the United States Court of Appeals for the D.C. Circuit, the FCC "issued a clarification order . . . expressly limiting its prior forfeiture order to the specific facts of the Carlin monologue."  *Id.* (citing *In re a 'Petition for Clarification or Reconsideration' of a Citizen's Complaint against Pacifica Found., Station WBAI(FM), New York, N.Y.*, 59 F.C.C. 2d 892 (1976)).  The D.C. Circuit reversed the FCC's forfeiture order as vague and overbroad, *Pacifica Found. v. FCC*, 556 F.2d 9, 14 (D.C. Cir. 1977), but the Supreme Court upheld the agency's action in a narrow plurality opinion, 438 U.S. 726 (1978).  The plurality "confirmed the general validity of the FCC's indecency regime" while at the same time "'emphasiz[ing] the narrowness of [its] holding,' which it confined to the facts of the Carlin monologue."  *CBS*, 535 F.3d at 176 (quoting *Pacifica*, 438 U.S. at 750) (alterations in original).  Justices Powell and Blackmun concurred in the judgment and wrote separately to underscore "the narrowness of the decision and to note the Court's holding did not 'speak to cases involving the isolated use of a potentially offensive word in the course

---

[3] "Congress authorized the FCC to impose forfeiture penalties for violations of 18 U.S.C. § 1464 in 1960."  *CBS*, 535 F.3d at 175; *see* Communications Act Amendments, 1960, Pub. L. No. 86-752, § 7, 74 Stat. 889, 894 (codified as amended at 47 U.S.C. § 503(b)(1)).

of a radio broadcast, as distinguished from the verbal shock treatment administered by respondent here.'" *Id.* (quoting *Pacifica*, 438 U.S. at 760–61 (Powell, J., concurring)).

Our previous opinion found that the FCC adopted a "restrained enforcement policy . . . in the years following *Pacifica*." *Id.* In a 1978 opinion, the FCC rejected a challenge to "several programs containing nudity and other allegedly offensive material." *Id.*; *see In re Application of WGBH Educ. Found.*, 69 F.C.C. 2d 1250 (1978) ("*WGBH*"). The agency, noting it "'intend[ed] strictly to observe the narrowness of the *Pacifica* holding' and emphasizing the language in Justice Powell's concurring opinion, concluded the single use of an expletive in a program 'should not call for us to act under the holding of *Pacifica*.'" *Id.* (quoting *WGBH*, 69 F.C.C. 2d at 1254, ¶ 10 n.6) (alteration in *CBS*).

In our view, three decisions issued in 1987 had "reaffirmed the Commission's restrained enforcement policy and reiterated the agency's policy that isolated or fleeting material would not be considered actionably indecent." *Id.* We acknowledged that, in a subsequent order reconsidering these decisions, "the Commission abandoned the view that only the particular 'dirty words' used in the Carlin monologue could be indecent," but we observed that the order on reconsideration "never indicat[ed] disagreement with those decisions' express statements that isolated or fleeting material could not be actionably indecent." *CBS*, 535 F.3d at 177; *see In re Infinity Broad. Corp.*, 3 FCC Rcd. 930 (1987), *vacated in part on other grounds*, *Action for Children's Television v. FCC*, 852 F.2d 1332, 1337 (D.C. Cir. 1988), *superseded in part by Action for Children's Television v. FCC*, 58 F.3d 654 (D.C. Cir. 1995) (en banc).

As noted, our earlier opinion concluded the *Golden Globes* opinion of March 3, 2004, was the first time the FCC indicated that fleeting material could be held indecent. That case involved an unscripted remark during a live NBC broadcast of the Golden Globe Awards on January 19, 2003, in which "musician Bono said 'this is really, really f[* * *] brilliant' while accepting an award." *CBS*, 535 F.3d at 177; *see Golden Globes*, 19 FCC Rcd. at 4976, ¶ 3 n.4. The FCC held the broadcast actionable, but it declined to impose a forfeiture penalty because "existing precedent would have permitted th[e] broadcast." *See Golden Globes*, 19 FCC Rcd. at 4981-82, ¶ 15 n.40 (citing *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618 (D.C. Cir. 2000)). We believed *Golden Globes* itself "made it clear that licensees could not be held liable for broadcasting fleeting or isolated indecent material prior to its *Golden Globes* decision." *CBS*, 535 F.3d at 178.

On February 21, 2006, the FCC issued an omnibus order resolving multiple indecency complaints against television broadcasters. *See In re Complaints Regarding Various Television Broads. Between Feb. 2, 2002 and Mar. 8, 2005*, 21 FCC Rcd. 2664 (2006). The Order found four programs, all of which involved the use of expletives,[4] to be

---

[4] The four programs were: "(1) Fox's broadcast of the 2002 Billboard Music Awards, in which performer Cher used an unscripted expletive during her acceptance speech; (2) Fox's broadcast of the 2003 Billboard Music Awards, in which presenter Nicole Richie used two unscripted expletives; (3) ABC's broadcast of various episodes of its NYPD Blue series, in which assorted characters used scripted expletives; and (4) a CBS broadcast of The Early Show, in which a guest used an unscripted expletive during a live interview." *CBS*,

13

indecent. But "[b]ecause the offending broadcasts occurred prior to the issuance of its *Golden Globes* decision, the FCC concluded that existing precedent would have permitted the broadcasts. Accordingly, the FCC did not issue forfeiture orders against any of the licensees." *CBS*, 535 F.3d at 178 (internal citations removed).

The networks nonetheless appealed the Order, which, as revised,[5] was invalidated in a 2-1 decision by the United States Court of Appeals for the Second Circuit. *See Fox Television Stations, Inc. v. FCC*, 489 F.3d 444 (2d Cir. 2007), *rev'd*, 129 S. Ct. 1800 (2009). Our earlier opinion explicitly refrained from engaging the issue that split the Second Circuit panel, *see CBS*, 535 F.3d at 182–83; we focused instead on that court's unanimous finding that the FCC's enforcement policy "prior to the *Golden Globes* decision [had consistently] excluded fleeting or isolated expletives from regulation," *id.* at 179 (citing *Fox*, 489 F.3d at 455). That conclusion, we believed, confirmed our view that until *Golden Globes*, the FCC's policy "was to exclude fleeting material from the scope of actionable indecency." *Id.* at 179 n.10.

The FCC did not categorically deny that its policy had

---

535 F.3d at 178 (citing *Various Television Broads.*, 21 FCC Rcd. at ¶¶ 101, 112 n.64, 125, 137).

[5] *See In re Complaints Regarding Various Television Broads. Between Feb. 2, 2002 and Mar. 8, 2005*, 21 FCC Rcd. 13299 (2006). The revised order reversed the finding that The Early Show broadcast was indecent and dismissed the complaint against ABC on procedural grounds. *Id.* at 13299, ¶ 1. The order reviewed by the Second Circuit (and subsequently by the Supreme Court) thus contained indecency determinations only as to the two Billboard Music Awards broadcasts.

exempted fleeting content from regulation. But it contended—and continues to contend—that the exemption had been limited to fleeting expletives and had never applied to fleeting images such as the one at issue here. According to the FCC, the *Golden Globes* opinion simply eliminated the exceptional treatment of fleeting expletives and subjected all broadcast content to the same contextual, multi-factor test, in which the material's fleeting nature is but one consideration to be weighed in the balance. Our previous opinion rejected this interpretation. We concluded that, on the contrary, "[i]n the nearly three decades between the Supreme Court's ruling in *Pacifica* and CBS's broadcast of the Halftime Show, the FCC had never varied its approach to indecency regulation based on the format of broadcasted content." *Id.* at 184; *see id.* at 181 ("[T]he Commission—before *Golden Globes*—had not distinguished between categories of broadcast material such as images and words."); *see also id.* at 180 ("Until its *Golden Globes* decision . . . the FCC's policy was to exempt fleeting or isolated *material* from the scope of actionable indecency." (emphasis added)). In our view, fleeting images, like all other fleeting content, were immune from regulation under the pre-*Golden Globes* regime. Accordingly, we believed that if the FCC were right that "*Golden Globes* only addressed expletives, . . . a residual [*per se* exemption] policy on other categories of fleeting material—including all broadcast content other than expletives—remained in effect," and that "subsequent agency action was required to change the fleeting material policy as it applied" to these remaining categories. *Id.* at 181.

The FCC had insisted that "any doubts about the historical breadth of its fleeting material policy prior to the Halftime Show" should have been "dispelled" by the FCC's

15

decision in *In re Young Broadcasting of San Francisco, Inc.*, 19 FCC Rcd. 1751 (2004), issued a few days before CBS's Super Bowl broadcast. *CBS*, 535 F.3d at 186. There, the FCC issued a Notice of Apparent Liability for Forfeiture to:

> a morning news show segment in which two performers from a production titled "Puppetry of the Penis" appeared in capes but were otherwise naked underneath the capes. The two men, whose act involved manipulating and stretching their genitalia to simulate various objects, performed a demonstration of their act with the agreement of the show's hosts and at the urging of off-camera station personnel. Although the performance was directed away from the camera, the penis of one performer was fully exposed on camera for less than one second as the men turned away to act out their performance.

*Id.* (citing *Young Broad.*, 19 FCC Rcd. at 1755-56, ¶¶ 12, 13). The FCC conceded that the offending image was "fleeting" but concluded it was nonetheless indecent given its explicit and pandering qualities. *Young Broad.*, 19 FCC Rcd. at 1755-57, ¶¶ 11–14. In the FCC's view, *Young Broadcasting* should have made clear to CBS that the fleetingness of an offending image would not necessarily immunize the broadcaster from liability.

Our previous opinion found this argument unconvincing. We believed the FCC's action in *Young Broadcasting* was hobbled by the same flaw that afflicted the forfeiture orders against CBS: it "fail[ed] to acknowledge the existence of [the FCC's] prior policy on fleeting material,"

16

instead "read[ing] the policy [of exempting fleeting material] out of existence by substituting new rationales for its prior indecency determinations that had applied the policy." *CBS*, 535 F.3d at 187. Because *Young Broadcasting* was, we believed, an invalid "initial effort to abandon [the FCC's] restrained enforcement policy on fleeting material," *id.*, that policy remained in effect at the time of the Halftime Show. And since the forfeiture orders against CBS similarly "fail[ed] to acknowledge" a change in FCC policy "on fleeting material," they were "unable to comply with the requirement . . . that an agency supply a reasoned explanation for its departure from prior policy." *Id.* at 188 (citing *State Farm*, 463 U.S. at 43). In sum, *Young Broadcasting* did not alter our conclusion that the FCC's orders violated the APA.

This violation of the APA was not the only flaw we identified in the FCC's orders. Even assuming the FCC's indecency finding had been valid, we would have found "the Commission [had] incorrectly determined CBS's liability for Jackson and Timberlake's Halftime Show performance." *Id.* at 189. Two of the FCC's three arguments for liability were untenable. First, the agency "contend[ed] the performers' intent c[ould] be imputed to CBS under the common law doctrine of *respondeat superior*." *Id.* We concluded, however, that "Jackson and Timberlake were independent contractors, who are outside the scope of *respondeat superior*, rather than employees as the FCC found." *Id.* at 189–98. Second, the FCC argued "because broadcast licensees hold non-delegable duties to avoid the broadcast of indecent material and to operate in the public interest," they are vicariously liable for the acts of even their independent contractors. *Id.* at 198. This proposition, we believed, could not be reconciled with the First Amendment. "[A]n unwitting

17

broadcaster might be held liable for its independent contractor's negligence in monitoring and maintaining a tower antenna without raising a constitutional question," but "the same cannot be said of imposing liability for the speech or expression of independent contractors." *Id.* at 199. "A broadcast licensee," we explained, "should not be found liable for violating the indecency provisions of [federal law] without proof the licensee acted with scienter. Because the Commission's proffered 'non-delegable duty' theory of CBS's vicarious liability, which functionally equates to strict liability for speech or expression of independent contractors, appears to dispense with this constitutional requirement," we concluded it could "not be sustained." *Id.* at 203.

"As an alternative to vicarious liability, the FCC found CBS directly liable for a forfeiture penalty . . . for failing to take adequate precautionary measures to prevent potential indecency during the Halftime Show." *Id.* According to the FCC, the touchstone under this theory was whether CBS had "acted willfully." *Reconsideration Order*, 21 FCC Rcd. at 6655, ¶ 5. The FCC did "not dispute" that CBS "neither planned Jackson and Timberlake's offensive actions nor knew of the performers' intent to incorporate those actions into their performance." *CBS*, 535 F.3d at 189. But the FCC believed CBS had satisfied the "willfulness" requirement based on the agency's finding that "CBS was acutely aware of the risk of unscripted indecent material" in the Halftime Show, but had nonetheless "consciously and deliberately failed to take reasonable precautions to ensure that no actionably indecent material was broadcast." *Reconsideration Order*, 21 FCC Rcd. at 6660, ¶ 17.

Without ruling on whether this third theory might ultimately sustain a finding of liability on the facts of this

18

case, we found certain key aspects of the FCC's reasoning "unclear." *CBS*, 535 F.3d at 189. First, we had doubts about whether the agency had "properly applied the forfeiture statute." *Id.* at 203; *see* 47 U.S.C. § 503(b)(1). Under 47 U.S.C. § 503(b)(1)(B), the FCC has authority to order forfeiture penalties upon determining that a person "willfully or repeatedly failed to comply with any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter." Another statutory subsection, § 503(b)(1)(D), authorizes forfeitures for violations of several specific statutory provisions, including the indecency statute, 18 U.S.C. § 1464. *See* 47 U.S.C. § 503(b)(1)(D). Although the FCC's orders sometimes specifically invoked § 503(b)(1)(B), *see, e.g.*, *Forfeiture Order*, 21 FCC Rcd. at 2778, ¶ 36, and its "willfulness" standard appears to represent the agency's interpretation of that subsection's express *mens rea* element, the orders referred in other places to § 503(b) or § 503(b)(1) only generally, without specifying the applicable subsection, *see, e.g.*, *Forfeiture Order*, 21 FCC Rcd. at 2760, ¶ 1 n.1; *Reconsideration Order*, 21 FCC Rcd. at 6655, ¶ 5. Given that § 503(b)(1)(D) expressly authorizes forfeitures for indecency violations, we questioned "whether the statutory scheme permits violations of 18 U.S.C. § 1464 to be penalized by forfeitures issued under section 503(b)(1)(B) instead of, or in addition to, section 503(b)(1)(D)." *CBS*, 535 F.3d at 205.

As noted, our previous opinion determined that "a showing of scienter is constitutionally required to penalize broadcast indecency." *Id.* Although § 503(b)(1)(B) contained an express *mens rea* standard, i.e. willfulness, and § 503(b)(1)(D) did not, we believed both provisions must be interpreted to "set a bar" to liability "at least as high as

19

scienter." *Id.* A key question, then, was what level of scienter was necessary to sustain a penalty for indecent expression. "Where a scienter element is read into statutory text," we observed, "scienter would not necessarily equate to a requirement of actual knowledge or specific intent." *Id.* at 206. Instead, "[t]he presumption in favor of scienter requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." *Id.* (quoting *Carter v. United States*, 530 U.S. 255, 269 (2000)). Applying this principle, we surmised that recklessness was a sufficiently culpable mental state for purposes of 18 U.S.C. § 1464. "It is likely," we explained, "that a recklessness standard would effectively separate wrongful conduct from otherwise innocent conduct of broadcasters without creating an end-around indecency restrictions that might be encouraged by an actual knowledge or intent standard." *Id.* (internal quotation marks and citation omitted). Moreover, we noted that recklessness had been found to be an adequate scienter standard in other contexts, including First Amendment contexts. *Id.* at 206–07.

The parties here had disputed whether CBS took adequate precautions with regard to the risk of indecency in the Halftime Show. The parties disagreed about whether certain events leading up to the broadcast—including public comments by Jackson's choreographer that the performance would include "some shocking moments"— indicated a high risk of indecent material. Another point of contention involved the role of video delay technology. Although CBS utilized a five-second audio delay, it did not delay its video broadcast. We found "[b]ecause the Commission carries the burden of showing scienter, it should have presented evidence to demonstrate, at a minimum, that CBS acted recklessly and

not merely negligently when it failed to implement a video delay mechanism for the Halftime Show broadcast." *Id.* at 208. Because we found the "record at present" was wanting in this regard, we were "unable to decide whether the Commission's determination that CBS acted 'willfully' was proper in light of the scienter [i.e., recklessness] requirement." *Id.*

Having determined the FCC's enforcement actions here were arbitrary and capricious, our previous decision vacated the forfeiture orders and remanded. Although we recognized the FCC could "not retroactively penalize CBS" for material that was not indecent under FCC policy at the time of broadcast, we explained the agency could still enter a declaratory order on remand, "set[ting] forth a new policy and proceed[ing] with its indecency determination even though a retroactive monetary forfeiture [would be] unavailable." *Id.* at 209. The remand also afforded the agency an opportunity to address the constitutionally required scienter element of the indecency standard.

## C.

While the FCC's petition for certiorari in this case was pending, the Supreme Court decided *Fox*. As noted, *Fox* reviewed the Second Circuit's decision invalidating monetary forfeitures issued against Fox and its affiliates for several unscripted expletives broadcast live during two different Billboard Music Awards ceremonies.[6] The FCC's forfeiture

---

[6] The first incident occurred during the 2002 Awards, "when the singer Cher exclaimed, 'I've also had critics for the last 40 years saying that I was on my way out every year. Right. So f* * * 'em.'" *Fox*, 129 S. Ct. at 1808. The second took

21

orders for fleeting expletives in *Fox*, unlike its orders penalizing a fleeting image here, "forthrightly acknowledged that [they were breaking] new ground." *Fox*, 129 S. Ct. at 1812. Nonetheless, the Second Circuit had found the agency's explanation for its policy change inadequate. In reviewing this determination, the Supreme Court gave its own account of the FCC's enforcement history.

The Court's chronicle, like ours, began with *Pacifica*'s sanction of George Carlin's "Dirty Words" routine. *Id.* at 1806. The Court explained that "[i]n the ensuing years, the Commission took a cautious, but gradually expanding, approach to enforcing the statutory prohibition against indecent broadcasts." *Id.* Like our previous opinion, *Fox* noted the FCC decided in 1987 that its enforcement power was not limited to "the seven words actually contained in the George Carlin monologue." *Id.* at 1807 (quoting *In re Pacifica Found., Inc.*, 2 FCC Rcd. 2698, 2699, ¶ 12 (1987)). But the Court in *Fox* observed something in the 1987 decisions that we had not mentioned: it found the FCC opinions expanding the scope of the agency's enforcement also

> preserved a distinction between literal and nonliteral (or 'expletive') uses of evocative language. The Commission explained that each literal "description or depiction of sexual or excretory functions must be examined in context to determine whether it is patently

place during the 2003 Awards, when Nicole Richie "proceeded to ask the audience, 'Why do they even call it 'The Simple Life'? Have you ever tried to get cow s* * * out of a Prada purse? It's not so f* * *ing simple.'" *Id.*

offensive," but that "deliberate and repetitive use . . . is a requisite to a finding of indecency" when a complaint focuses solely on the use of nonliteral expletives.

*Id.* (quoting *Pacifica Found.*, 2 FCC Rcd. at 2699, ¶ 13) (alteration in original) (citation omitted).

The Court in *Fox* found the *Golden Globes* decision was "the first time" the FCC declared "that a nonliteral (expletive) use of the F- and S-words could be actionably indecent, even when the word is used only once." *Id.* Because the broadcasts at issue in *Fox* had occurred prior to the *Golden Globes* order, the FCC had "declined to assess penalties." *Id.* at 1812. Accordingly, the indecency determinations in *Fox* did not pose a notice or due process problem, and the Court's majority opinion limited itself exclusively to the question of whether the FCC's explanation for holding fleeting or isolated expletives indecent—which largely echoed the justification proffered in *Golden Globes*—passed muster under the APA.

The Court answered that question in the affirmative. The Court rejected the principle (espoused by the Second Circuit) that "agency action that changes prior policy" requires "a more substantial explanation" than does action in an area previously untouched. *Id.* at 1810. Although "[a]n agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books . . . it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* at 1811. Accordingly, the Court concluded an "agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate."

*Id.*

Judged under this clarified standard, the FCC orders at issue in *Fox* were not arbitrary and capricious. *Id.* at 1812–19. The FCC acknowledged its change in policy, and the Court found its reasons for including fleeting expletives within the scope of actionable indecency to be "entirely rational." *Id.* at 1812. In making this determination, the Court compared the FCC's policy toward fleeting expletives with its treatment of other offensive material. "It was certainly reasonable," the Court believed, for the agency "to determine that it made no sense to distinguish between literal and nonliteral uses of offensive words, requiring repetitive use to render only the latter indecent." *Id.* The *per se* exemption for fleeting expletives, the Court explained, had been an anomaly:

> When confronting other requests for *per se* rules governing its enforcement of the indecency prohibition, the Commission ha[d] declined to create safe harbors for particular types of broadcasts. The Commission could rationally decide it needed to step away from its old regime where nonrepetitive use of an expletive was *per se* nonactionable because that was at odds with the Commission's overall enforcement policy.

*Id.* at 1813 (internal citations and quotation marks omitted). Because "[e]ven isolated utterances can be made in pand[ering,] . . . vulgar and shocking manners," the Court found it rational for the FCC to cease providing "a safe harbor for single words" and subject them instead to the agency's general "context-based" test for "patent offensiveness." *Id.* at

1812–13 (internal quotation marks omitted) (second alteration and omission in original).

## II.

According to the FCC, *Fox* stands for the proposition that the safe harbor had extended only to isolated expletives, i.e. non-literal language, and not, as we had originally concluded, to all fleeting material. The FCC points to *Fox*'s statement that FCC policy historically subjected "description[s] or depiction[s]" of sexual organs or functions to a contextual standard, reserving a safe harbor only for "nonliteral expletives." *Id.* at 1807 (quoting *Pacifica Found.*, 2 FCC Rcd. at 2699, ¶ 13). Because images are "depictions," the FCC argues, *Fox* tells us that images were not entitled to a safe harbor.

CBS, by contrast, denies that anything in *Fox* undermines our previous conclusion that the FCC's forfeiture orders represented a change in policy. "*Fox*," CBS argues, "does not involve allegedly indecent images, and focuses solely on words uttered." CBS Letter-Brief 6 (Jan. 29, 2010). In CBS's view, *Fox*'s discussion of the 1987 FCC opinion *Pacifica Foundation* is "utterly irrelevant" to the issue before us. *Id.* at 1. In its view, *Fox*'s identification of a distinction between the treatment of literal utterances and nonliteral expletives is merely background information incidental to the Supreme Court's holding and therefore dicta. The FCC, on the other hand, argues the Court's description of the FCC's historic enforcement policy is integral to its holding that the FCC orders in *Fox* complied with the APA.

I believe *Fox*'s distinction between the FCC's historic treatment of different kinds of fleeting material undermines a

25

key premise of our earlier opinion. Our opinion did not rest on an explicit statement by the FCC that fleeting images would be *per se* exempt from indecency regulation. Instead, we identified FCC decisions that had held certain isolated words immune from the enforcement regime. *See, e.g.*, *CBS*, 535 F.3d at 176 (quoting *WGBH*, 69 F.C.C. 2d at 1254, ¶ 10 n.6). In addition, after reviewing the entirety of the agency's enforcement history up until the Halftime Show, we found "the FCC had never varied its approach to indecency regulation based on the format of broadcasted content." *Id.* at 184. Accordingly, we concluded the FCC's enforcement policy had contained a blanket rule exempting all fleeting material, without qualification, from the indecency standard.

In *Fox*, however, the Supreme Court states that FCC policy did, in fact, make distinctions "based on the format of broadcasted content." As the Court interpreted the FCC's pre-*Golden Globes* enforcement history, "literal 'description[s] or depiction[s] of sexual or excretory functions'" were subject to a multi-factor test and could potentially be found indecent notwithstanding their fleeting or nonrepetitive character, *Fox*, 129 S. Ct. at 1807 (quoting *Pacifica Found.*, 2 FCC Rcd. at 2699, ¶ 13); the safe harbor for fleetingness encompassed only the "use of nonliteral expletives," *id.* "Although the Commission had expanded its enforcement beyond the 'repetitive use of specific words or phrases,' it preserved a distinction between literal and nonliteral (or 'expletive') uses of evocative language." *See id.* at 1807. *Fox* therefore contradicts and undermines our previous holding that FCC enforcement policy embodied a general exemption for all fleeting material.[7] Moreover, *Fox*

---

[7] I acknowledge that the allegedly indecent material at issue in *Fox* involved only words, and that *Fox*'s discussion of the

describes the narrow safe harbor for fleeting "nonliteral expletives" or "evocative language" as a deviation from the default rule of contextual analysis. The *per se* exemption, *Fox* explains, was "at odds with the Commission's overall enforcement policy." *Id.* at 1813. "When confronting other requests for *per se* rules governing its enforcement of the indecency prohibition, the Commission ha[d] declined to create safe harbors for particular types of broadcasts." *Id.*

In other words, *Fox* identifies contextual analysis as the default policy for all broadcast content, with the narrow exception of nonliteral expletives. Although my colleagues emphasize the omission of any specific discussion of images in *Fox*, our earlier opinion's finding of a safe harbor for fleeting images was premised on a *per se* exemption for fleeting content generally. As *Fox* portrays the FCC's enforcement history, however, no such general policy existed. Instead, the Court concluded that the safe harbor for fleeting nonliteral expletives was an isolated exception rather than an instance of a more general rule. It reasoned that the removal

FCC enforcement policy is not on its face addressed to the agency's treatment of images. But the Court's account of FCC enforcement policy and history limits the fleeting exemption solely to nonliteral use of "evocative language." *See id.* at 1807. The Court noted that the FCC had rejected other types of exemptions. *See id.* at 1813 ("When confronting other requests for *per se* rules governing its enforcement of the indecency prohibition, the Commission has declined to create safe harbors for particular types of broadcasts."). The structure of the Court's discussion conveys that the Court viewed the exception for nonliteral expletive language as an exception at odds with the FCC's treatment of all other material, including images.

of this exception allowed the FCC to bring treatment of fleeting indecent language into harmony with its overall enforcement policy. *Fox*, 129 S. Ct. at 1813. The existence of a similar safe harbor for fleeting images would have undermined this key holding of *Fox*. The Court's omission of any discussion of fleeting images strongly suggests that, rather than constituting a *per se* exception, such instances fell within the contextual approach that the Court identified as the "Commission's prior enforcement practice." *Fox*, 129 S. Ct. at 1814. It follows that the FCC's decision to apply a contextual analysis to the fleeting image in this case did not represent a change in policy.

The Court's holding expressly relied on the distinctions it identified in the FCC's historic treatment of different types of fleeting content. In concluding the agency's reasons for eliminating a safe harbor for fleeting "nonliteral expletives" were "entirely rational," the Court explained that "[i]t was certainly reasonable to determine that it made no sense to distinguish between literal and nonliteral uses of offensive words, requiring repetitive use to render only the latter indecent." *Id.* at 1812. The very fact that the safe harbor for fleeting expletives was an isolated exception to the FCC's general contextual standard was itself, the Court said, a defensible reason for the policy change announced in *Golden Globes* and *Fox*: "The Commission could rationally decide it needed to step away from its old regime where nonrepetitive use of an expletive was *per se* nonactionable because that was at odds with the Commission's overall enforcement policy." *Id.* at 1813 (internal quotation marks omitted).

As this examination of *Fox* makes clear, the Supreme Court's account of the FCC's pre-*Golden Globes* enforcement

policy is not characterization, but central to *Fox*'s holding. Given that account, I would hold that the FCC's indecency determination in this case did not constitute a change of policy—unacknowledged or otherwise—and was not arbitrary and capricious under the APA.[8]

---

[8] Our previous opinion identified several FCC decisions in which the FCC had found that certain fleeting images did not violate the indecency standard. *See CBS*, 535 F.3d at 184–86. We believed these decisions supported our conclusion that FCC policy had afforded a safe harbor to all fleeting material. In none of these cases, however, did the FCC state that fleeting images were *per se* nonactionable. In light of *Fox*, I believe that these decisions are also compatible with a contextual standard. Precisely because the reasoning in many of these opinions is sparse, they may be read as holding not that the fleeting quality of the images was *per se* dispositive but rather that, in the particular context presented, the image's transience outweighed any countervailing factors.

CBS argues that even if fleeting material did not enjoy a *per se* exemption under FCC policy, the agency applied its contextual standard differently here that it had in earlier cases where fleetingness proved dispositive. "[P]atently inconsistent applications of agency standards to similar situations are by definition arbitrary." *South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 103 (1st Cir. 2002). But CBS has not shown that the facts in this case are materially indistinguishable from a case in which the agency found no indecency. As we have recognized, "an agency's interpretation of its own precedent is entitled to deference." *CBS*, 535 F.3d at 180 (quoting *Cassell v. FCC*, 154 F.3d 478, 483 (D.C. Cir. 1998)). Given the nature of the FCC's contextual standard, each case is likely to present a unique

In our earlier opinion, we determined that if the policy change set forth in *Golden Globes* and *Fox* addressed only fleeting expletives, as the FCC has asserted, then it left in place a safe harbor for all other fleeting content. *CBS*, 535 F.3d at 181. *Fox* held precisely the opposite—that in eliminating a safe harbor for fleeting expletives in *Golden Globes* and *Fox*, the FCC made a reasonable decision to abolish an anomalous exception and establish a uniform contextual test for all allegedly indecent material. The rationale of the FCC decision suggested by our earlier opinion—to eliminate a safe harbor for presumptively less offensive fleeting expletives while maintaining a *per se* exemption for fleeting literal utterances and potentially graphic images—would appear more dubious. In short, our earlier opinion is irreconcilable with the reasoning by which the Supreme Court upheld the FCC orders in *Fox*.

CBS argues that even if the indecency determination here did not constitute a change of policy, the forfeiture penalty must be invalidated because CBS was not sufficiently "on notice" of its potential liability for fleeting images. "Because due process requires that parties receive fair notice before being deprived of property. . . in the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *Trinity Broad. of Fla., Inc. v. FCC*, 211

---

balance of factors, and I cannot say that the FCC acted unreasonably in determining that the fleetingness of the image here was outweighed by its graphic and pandering qualities.

F.3d 618, 628 (D.C. Cir. 2000) (internal quotation marks and alterations omitted). Referring to the 1987 FCC decision quoted by *Fox*, CBS submits that "no fine [in this case] can be justified based on a cryptic reference in dictum that was never discussed or applied for over two decades." CBS Letter-Brief at 18.

CBS's argument implicitly assumes that the 1987 decision was the only indication by the FCC that fleeting images were potentially actionable. But that is not the case. At the very least, the FCC's opinion in *Young Broadcasting*, which involved somewhat similar facts and was issued only days before the Halftime Show, made clear that fleeting images of nudity could be found indecent if presented in a sufficiently explicit and pandering fashion. In issuing its Notice of Apparent Liability in that case, the FCC explained that "although the actual exposure of the performer's penis was fleeting in that it occurred for less than a second," this mitigating factor was outweighed by the explicitness and pandering quality of the image's presentation. *Young Broad.*, 19 FCC Rcd. at 1754–55, ¶¶ 10–12; *see also id.* ("In particular cases, one or two of the factors may outweigh the others, either rendering the broadcast material patently offensive and consequently indecent, or, alternatively, removing the broadcast material from the realm of indecency." (footnotes omitted)).[9]

---

[9] It is true, as we noted in our previous opinion, that *Young Broadcasting* "makes no distinction, express or implied, between words and images." *CBS*, 535 F.3d at 186. The FCC's opinion suggests that *all* fleeting content is subject to a contextual standard and fails to acknowledge even the limited safe harbor for fleeting expletives identified in *Fox*. *See*

In our earlier opinion, we acknowledged that *Young Broadcasting* found a nude image indecent despite its fleetingness, but we declined to give effect to the FCC's decision because we believed it amounted to an unacknowledged change in policy in contravention of the APA. *See CBS*, 535 F.3d at 187 (describing *Young* as "the Commission's initial effort to abandon its restrained enforcement policy on fleeting material"). We held, in other words, that *Young Broadcasting* could not have validly changed the FCC's policy with regard to fleeting material and could not therefore have relieved the FCC of the obligation to acknowledge and explain its new policy. As noted, however, I would revisit and revise our APA conclusion on the basis of *Fox* and no longer find that FCC policy historically

*Young Broad.*, 19 FCC Rcd. at 1754–55, ¶¶ 10, 12 n.35; *see also Industry Guidance* 16 FCC Rcd. at 8003, ¶ 10 (stating, without any mention of a *per se* exemption for fleeting expletives, that under the FCC's analytical framework, "[n]o single factor generally provides the basis for an indecency finding"). That *Young Broadcasting* overstated the historic scope of liability, however, does not preclude that case from furnishing adequate notice of broadcast licensees' potential liability for fleeting images; if anything, this error served to underscore the risk of liability. The FCC's forfeiture order here reflected the FCC's understanding that all fleeting material would be subject to a contextual standard. *See Forfeiture Order*, 21 FCC Rcd. at 2766, ¶12 (concluding that "even though we find that the partial nudity [broadcast at the end of the Halftime Show] was fleeting, the brevity of the partial nudity is outweighed by the first and third factors of our contextual analysis").

immunized fleeting material from regulation.[10]   The finding
of indecency for the fleeting imagery in *Young Broadcasting*
put CBS on notice that FCC policy did not afford fleeting
images an automatic exemption from indecency regulation.

My colleagues offer an alternate interpretation of
*Young Broadcasting* as an application of "an exception within
the [*per se*] exception."[11]   Majority op. at 26.   They also
believe that *Young Broadcasting* could not provide CBS with
notice because it was a non-final notice of apparent liability.
*Id.* at 19.   Both interpretations are inapposite.   The most
straightforward reading of *Young Broadcasting* reveals the
FCC applying a contextual standard rather than a set of nested
exceptions, weighing all three factors with no one being
determinative.[12]   Moreover, despite my colleagues' emphasis

---

[10] I will not address CBS's constitutional challenge to the
indecency standard.  *See infra* Section IV.

[11] It bears noting that the FCC in this case made the same
finding as in *Young Broadcasting* that "the material was
apparently intended to pander to, titillate and shock viewers."
*Forfeiture Order*, 21 FCC Rcd. at 2763, ¶ 3, 2766-67, ¶13,.
If there is indeed an "exception within the exception" for
titillating and shocking content,  it would appear to apply in
this instance as well.

[12] My colleagues argue that the FCC recognized an exemption
in *Young Broadcasting* because it cited prior FCC decisions
concluding that the fleetingness of an image tended to weigh
in favor of a finding of no liability.  Majority op. at 26.  But
the FCC discussed fleetingness in *Young Broadcasting* in the
context of the three-factor contextual standard.  *See Young
Broad.*, 17 FCC Rcd. at 1755 ("In particular cases, one or two
of the factors may outweigh the others, either rendering the
broadcast  material  patently  offensive  and  consequently

on notice, this standard was not a new departure for the FCC. *Young Broadcasting*'s use of a contextual standard is consistent with the FCC's 2001 *Industry Guidance* and the Court's account of FCC enforcement in *Fox*. The case's unexceptional application of an established legal standard was sufficient to alert CBS to the possibility that fleeting images might be deemed indecent.

Following *Fox*, I cannot say that the FCC changed its policy by applying its contextual, three-factor standard to a fleeting image. Therefore I cannot join the majority's holding that the forfeiture orders were arbitrary and capricious under the APA. Under *Young Broadcasting*, it was apparent before the Halftime Show that fleeting images could, depending on the context, be deemed indecent. For this reason, CBS was adequately on notice of the policy the FCC applied in this case.

## III.

Whether Jackson and Timberlake's performance was indecent is a distinct question from whether CBS can be held liable for the live broadcast of that performance. Because I would uphold the FCC's orders under the APA, the latter question, which we examined in our prior ruling, has heightened importance.

## A.

---

indecent, or, alternatively, removing the broadcast material from the realm of indecency. In this case, we examine all three factors. . . ." (footnote omitted)). It did not state there was a *per se* exception for all fleeting images.

34

CBS challenges the ability of Congress or the FCC to regulate any indecency on broadcast television within the bounds of the First Amendment. It contends technological change has undercut the traditional rationale for providing lesser protection to broadcasting in relation to other modes of speech. In *Pacifica*, the plurality noted the scarcity of available frequencies and the need for licensing has always subjected broadcasters' speech to greater regulation—including restrictions on speech that is indecent but not obscene. *See Pacifica*, 438 U.S. at 748 ("[I]t is broadcasting that has received the most limited First Amendment protection. Thus, although other speakers cannot be licensed except under laws that carefully define and narrow official discretion, a broadcaster may be deprived of [its] license and [its] forum if the Commission decides that such an action would serve 'the public interest, convenience, and necessity.'"). *Pacifica* noted that broadcast television is uniquely pervasive in American life and uniquely accessible to children. *Id.* at 748-50. Given the array of media currently available, CBS argues broadcast television no longer inhabits the unique and ubiquitous role in American society that the Court found made it deserving of lesser First Amendment protection. Notwithstanding this criticism, the Supreme Court has given no hint it views subsequent technological changes as undermining *Pacifica*'s rationale that the unique characteristics of this medium allows Congress to regulate indecent speech on broadcast television.

## B.

After oral argument on remand, we requested supplemental briefing on the proper standard of scienter. The FCC no longer presses theories of vicarious liability and non-delegable duty we rejected in our prior decision. Nor does it

35

appear to contest our prior judgment that CBS can be held liable only if it acted recklessly in broadcasting the offending image. Accordingly, the FCC requests a remand so that it may determine whether CBS acted with the required *mens rea*. CBS disputes the FCC's characterization of the scienter threshold and contends there is no factual basis for a forfeiture penalty.

Congress has authorized the FCC to impose monetary forfeitures in several circumstances. *See* 47 U.S.C. § 503(b)(1). Two provisions are relevant here. Section 503(b)(1)(B) permits a penalty for "willfully or repeatedly fail[ing] to comply with any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter," and § 503(b)(1)(D) authorizes a forfeiture for "violat[ing] any provision of section . . . 1464 . . . of Title 18." 47 U.S.C. § 503(b)(1)(B), (D). Although the FCC referenced § 503(b)(1)(D), its forfeiture orders in this case appear to rest solely on the authority of § 503(b)(1)(B). *See, e.g.*, *Forfeiture Order*, 21 FCC Rcd. at 2776, ¶ 29 n.103 (explaining that because the FCC had found CBS liable under § 503(b)(1)(B), there was no need to "address whether [CBS] could also be held responsible under Section 503(b)(1)(D)").

Our previous opinion expressed skepticism about the applicability of § 503(b)(1)(B) to indecency violations. *CBS*, 535 F.3d at 203-04. I would hold Congress intended the FCC to proceed under § 503(b)(1)(D) when sanctioning indecency violations. "Ordinarily, where a specific provision conflicts with a general one, the specific governs." *Edmond v. United States*, 520 U.S. 651, 657 (1997). Here, § 503(b)(1)(B) speaks generally of violations of "any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter." Section 503(b)(1)(D), on

36

the other hand, refers specifically to having "violated any provision of section . . . 1464 . . . of Title 18."

The history of the forfeiture statute supports the view that Congress intended § 503(b)(1)(D) as the vehicle to impose forfeitures for airing indecent material. Both forfeiture provisions were originally enacted as part of the same set of amendments to the Communications Act. *See* Communications Act Amendments, 1960, Pub. L. No. 86-752, § 7, 74 Stat. 889, 894. At the time of enactment, § 503(b)(1)(B) could not have applied to indecency violations because 18 U.S.C. § 1464 was the only provision of federal law proscribing indecency; none of the "provisions of th[e] chapter" containing § 503(b)(1)(B), nor "any rule, regulation, or order issued by the Commission under th[at] chapter" addressed the subject of indecency. The FCC has argued that 47 C.F.R. § 73.3999, which was not promulgated until 1988, brought the indecency standard within the scope of § 503(b)(1)(B). But § 73.3999, which is entitled "Enforcement of 18 U.S.C. § 1464," merely establishes the hours of the day when 18 U.S.C. § 1464 will be enforced. Given the statutory history, I believe Congress intended violations of 18 U.S.C. § 1464 to be enforced under 47 U.S.C. § 503(b)(1)(D) and not § 503(b)(1)(B). And since 47 C.F.R. § 73.3999 merely enforces 18 U.S.C. § 1464's substantive standard, it did not serve to bring indecency violations under the authority of § 503(b)(1)(B).

Even if § 503(b)(1)(B) were applicable to indecency actions, I am skeptical that it would authorize a forfeiture in this case. The provision requires a showing that a licensee "willfully or repeatedly" violated a statutory or regulatory standard. According to the statutory definition, "the term 'willful,' when used with reference to the commission or

37

omission of any act, means the conscious and deliberate commission or omission of such act." 47 U.S.C. § 312(f). The FCC does not contend that CBS knew that Timberlake would expose Jackson's breast, or intended that display to occur. Instead, the FCC believes CBS's actions were "willful" insofar as the network "consciously and deliberately" failed to take precautions despite the alleged existence of a known or obvious risk that indecent material would be broadcast. But since the act that must be "willful" is, in this context, the violation of 18 U.S.C. § 1464, it would appear that CBS cannot be held liable unless it "consciously and deliberately" broadcast the specific material deemed indecent. The FCC argues the act can be either a commission or omission—here (in the view of the FCC) the failure to take necessary precautions. But even if an omission can support a finding of a violation of § 503(b)(1)(B), the omission still must be "willful." The reckless omission of "precautions" would seem insufficient to satisfy the willfulness requirement of § 503(b)(1)(B).

Although I would find the FCC's orders relied on inapposite statutory authority, I do not believe this error precludes the FCC from applying § 503(b)(1)(D) on remand. *See WorldCom, Inc. v. FCC*, 288 F.3d 429, 430 (D.C. Cir. 2002) (remanding rulemaking where the FCC had relied on an inapposite statutory provision "[b]ecause there may well be other legal bases for adopting the rules chosen by the Commission"); *see also Castaneda-Castillo v. Gonzales*, 488 F.3d 17, 25 (1st Cir. 2007) ("If the agency decision is flawed by mistaken legal premises, . . . remanding to give the agency an opportunity to cure the error is the ordinary course." (emphasis omitted)); *cf. SEC v. Chenery Corp.*, 332 U.S. 194, 200-01 (1947) ("The fact that the [agency] had committed a

38

legal error in its first disposition of the case certainly gave [the prejudiced party] no vested right to receive the benefits of such an order.").

The Supreme Court has directed as a general matter:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). There have been few instances where courts have found "rare circumstances." One such circumstance is "when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice." *Sierra Club v. Peterson*, 185 F.3d 349, 369 (5th Cir. 1999) (quoting *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997)). Of course, remand is not required where a proper application of the correct standard could yield only one possible result. *See George Hyman Constr. Co. v. Brooks*, 963 F.2d 1532, 1539 (D.C. Cir. 1992) ("[W]e find that a remand would be futile on certain matters as only one disposition is possible as a matter of law."). But where "the answer the [agency] might give were it to bring to bear on the facts the proper administrative and statutory considerations" is "[s]till unsettled," remand is the proper course. *Chenery*, 332 U.S. at

200. As I believe, following *Fox*, the FCC did not act in an arbitrary and capricious manner, whether CBS can be held liable for its broadcast of the Halftime Show is still unsettled.[13] That is the case here; the "function" of applying the proper liability standard to the facts of this case "belongs exclusively to the Commission in the first instance." *Id.*

## C.

### 1.

Section 503(b)(1)(D), unlike § 503(b)(1)(B), does not contain an express scienter requirement. On remand, both parties agree that scienter is a prerequisite of liability under § 503(b)(1)(D) and 18 U.S.C. § 1464, but they dispute what mental state is required. The FCC contends that recklessness suffices, while CBS insists it can be liable only if it had knowledge the Halftime Show would contain indecent material and it intended to violate the indecency standard.

In most criminal or civil actions for obscenity or indecency, the element of scienter as to the broadcast's content will not be in doubt as "the defendant will necessarily know the contents of his utterances." *United States v. Smith*, 467 F.2d 1126, 1129 (7th Cir. 1972). Scienter will be an issue in forfeitures under § 1464, where, as here, live, unscripted events are broadcast. The broadcaster may not have forewarning of a potentially-indecent unscripted or

---

[13] Accordingly, I believe, as our prior opinion held, that even if the FCC's forfeiture order were arbitrary and capricious, the FCC could on remand issue a finding of indecency without a civil forfeiture as it did in *Golden Globes*. *CBS*, 535 F.3d at 209.

spontaneous event. Nor might the conduct of a third-party or independent contractor necessarily be imputed to the broadcaster. Live broadcasts, as opposed to scripted or "taped" programming, will always carry the possibility or risk of transmitting indecent material.

Against this backdrop, I believe recklessness is the constitutional minimum standard for scienter when imposing forfeiture penalties. "The presumption in favor of scienter requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." *Carter v. United States*, 530 U.S. 255, 269 (2000) (internal quotation marks omitted). Recklessness provides sufficient protection under the First Amendment to speech in similar contexts. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (allowing the imposition of liability upon a showing that the defendant published a statement with "reckless disregard" of the risk it was false); *see also CBS*, 535 F.3d at 206–07 (citing *Osborne v. Ohio*, 495 U.S. 103 (1990)) ("Also instructive here are other cases determining recklessness to be an adequate level of scienter for imposing liability in related First Amendment contexts where speech or expression is restricted based on its content.").[14]

Imposing a higher scienter standard than recklessness, such as the actual knowledge or intent standard urged by CBS, dilutes the duty imposed by Congress in 18 U.S.C. §

---

[14] At common law, the concept of recklessness could be expressed in a variety of ways. Historically, terms such as malicious or wanton "were used interchangeably with recklessness." David M. Treiman, *Recklessness and the Model Penal Code*, 9 Am. J. Crim. L. 281, 293 (1981).

1464 and risks creating an end-around indecency restrictions.[15] Such a standard could permit "willful

[15] CBS also argues that the FCC must show it specifically intended to violate the indecency prohibition in § 1464. CBS relies on pre-*Pacifica* case law addressing prosecutions for scripted broadcasts of obscene or indecent material. *See United States v. Smith*, 467 F.2d 1126 (7th Cir. 1972); *Tallman v. United States*, 465 F.2d 282 (7th Cir. 1972); *Gagliardo v. United States*, 366 F.2d 720 (9th Cir. 1966). These cases have limited value as they address criminal prosecutions for scripted content. *See Pacifica*, 438 U.S. at 747 n.25 (Stevens, J., plurality op.) (differentiating precedents addressing criminal prosecutions and the First Amendment by noting "[e]ven the strongest civil penalty at the Commission's command does not include criminal prosecution"). Furthermore, *Pacifica* did not require the FCC show specific intent for the civil forfeiture at issue there nor did the Court cite to any of the cases on which CBS relies.

Even under the pre-*Pacifica* cases, this "specific intent" requirement of § 1464 is satisfied if one should have known the utterance or broadcasting of such speech would violate the law. In *Tallman v. United States*, upon which CBS relies, the Seventh Circuit in interpreting § 1464 concluded that "specific intent" is present under the standard traditionally used at common law "if the defendant knew or reasonably should have known that uttering the words he did over the air was a public wrong." 465 F.2d at 288; *see also Smith*, 467 F.2d at 1130 n.2 (citing *Tallman* for the proposition "an appropriate instruction as to specific intent under this statute might be that 'the defendant knew or reasonably should have known that uttering the words he did over the air was a public wrong'"). Even these pre-*Pacifica*

blindness" or allow broadcasters to fail to take reasonably available precautions (such as implementing delay technologies) despite any obvious risks, and then evade responsibility if indecent material is broadcast, claiming they neither intended nor were aware that the indecent material would be broadcast. End runs might also be effected through the use of independent contractors. Accordingly, I do not believe liability for indecent broadcasts requires a showing of actual knowledge, actual awareness, or intent on the part of the broadcaster.[16]

**2.**

The question remains what is the proper standard of recklessness under § 1464. As an alternative argument, CBS

precedents addressing criminal prosecutions recite an "objective" or "reasonable person" standard for scienter.

[16] The cases cited by CBS in defense of its proposed *mens rea* standard are inapposite, because in each case Congress had already provided a scienter standard as to some elements of the statutory offense. *See Flores-Figueroa v. United States*, 129 S. Ct. 1886 (2009); *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994). In each of these cases, the statute in question contained some mental state language, such as "knowingly," that when read naturally did not appear to modify all the elements in the statute, *see* 18 U.S.C. § 1028A(a)(1); 18 U.S.C. § 2252. The Court only addressed whether the express scienter term applied to every element of the statutory offense or whether the term modified a single element of the offense. These cases do not address what mental state requirement should be read into provisions like 47 U.S.C. § 503(b)(1)(D) and 18 U.S.C. § 1464 that contain no *mens rea* language whatsoever.

contends there is more than one possible definition of recklessness, and the more demanding criminal standard ought to apply here. As the Supreme Court has explained:

> [t]he civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. The criminal law, however, generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware.

*Farmer*, 511 U.S. at 836-37 (internal citations omitted); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 n.18 (2007) ("Unlike civil recklessness, criminal recklessness also requires subjective knowledge on the part of the offender.").

In my view, the FCC may on remand seek a civil forfeiture under 47 U.S.C. § 503(b)(1)(D), but CBS's alleged liability is predicated on its violation of 18 U.S.C. § 1464, a criminal statute. For this reason, CBS contends the level of scienter cannot vary based on whether the FCC pursues civil remedies or the Department of Justice charges criminal offenses. Notwithstanding the civil character of the forfeiture action, CBS contends it can be held liable for a forfeiture penalty only if it were criminally reckless—if it disregarded an unjustifiably high risk of broadcast indecency of which it was aware. *Farmer*, 511 U.S. at 836-37. The FCC counters that in *Pacifica* the Supreme Court already interpreted the standard for civil forfeitures for indecency violations independent from § 1464's criminal applications, making clear the civil recklessness standard applies.

I believe a civil standard best comports with Congressional intent. In 1960, Congress expanded the civil forfeiture provisions of the Federal Communications Act to allow the FCC greater flexibility to regulate the broadcast medium. Before the 1960 Act, the FCC's regulatory tools were limited to revoking the broadcaster's license or asking the Department of Justice to commence criminal proceedings.[17] Communication Act Amendments, 1960, H.R. Rep. No. 86-1800, at 17. The FCC asked Congress to "provide it with an effective tool in dealing with violations where revocation or suspension does not appear to be appropriate." *Id*. The House Report explaining the amendments indicated that to achieve the desired flexibility the civil forfeiture provisions should be read as independent from other enforcement provisions. The Report states "the FCC will not be precluded from ordering a forfeiture merely because another type of sanction or penalty has been or may be applied to the licensee or permittee." *Id.*

The most telling argument in favor of a civil standard is the Supreme Court's opinion in *Pacifica*. As noted by the FCC, the plurality in *Pacifica* recognized that Congress intended the civil provisions of the Communications Act to be interpreted and applied apart from the criminal provisions. The plurality stated in footnote 13:

> The statutes authorizing civil penalties incorporate § 1464, a criminal statute. See 47

---

[17] Prior to 1960, § 503 only authorized forfeitures for accepting rebates or offsets that deviated from the tariff rates for the transmission of wire or radio messages. Federal Communications Act of 1934, Pub. L. No. 73-416, § 503, 48 Stat. 1064, 1101 (1934).

45

U.S.C. §§ 312(a)(6), 312(b)(2), and 503(b)(1)(E) (1970 ed. and Supp. V). But the validity of the civil sanctions is not linked to the validity of the criminal penalty. The legislative history of the provisions establishes their independence. As enacted in 1927 and 1934, the prohibition on indecent speech was separate from the provisions imposing civil and criminal penalties for violating the prohibition. Radio Act of 1927, §§ 14, 29, and 33, 44 Stat. 1168 and 1173; Communications Act of 1934, §§ 312, 326, and 501, 48 Stat. 1086, 1091, and 1100, 47 U.S.C. §§ 312, 326, and 501 (1970 ed. and Supp. V). The 1927 and 1934 Acts indicated in the strongest possible language that any invalid provision was separable from the rest of the Act. Radio Act of 1927, § 38, 44 Stat. 1174; Communications Act of 1934, § 608, 48 Stat. 1105, 47 U.S.C. § 608. Although the 1948 codification of the criminal laws and the addition of new civil penalties changed the statutory structure, no substantive change was apparently intended. *Cf. Tidewater Oil Co. v. United States*, 409 U.S. 151, 162. Accordingly, we need not consider any question relating to the possible application of § 1464 as a criminal statute.

*Pacifica*, 438 U.S. at 739 n.13. Under *Pacifica*, the level of scienter to prove a violation of § 1464 need not be the same for both criminal and civil applications. Of course, the respective penalties are different. Violation of 18 U.S.C. § 1464 carries a statutory maximum penalty of up to two years

46

imprisonment and a fine of up to $250,000 for individuals and $500,000 for organizations. 18 U.S.C. §§ 1464, 3571(b)-(c). At the time of the alleged violation,[18] a forfeiture under 47 U.S.C. § 503(b)(1) carried a maximum forfeiture of §27,500 for each station. *Reconsideration Order*, 21 FCC Rcd. at 6654, ¶ 2. As the FCC found twenty stations aired the indecent material in the Halftime Show, it imposed a forfeiture on CBS of $550,000 (twenty violations at the maximum $27,500 per violation). *Id.*

CBS relies on *FCC v. American Broadcasting Co.*, 347 U.S. 284 (1954). In *ABC*, the FCC desired to ban "give away" contests where radio and television stations would distribute prizes to listeners and viewers who called in and correctly answered a question or solved a puzzle. 347 U.S. at 286-87. To this end, the FCC promulgated regulations interpreting 18 U.S.C. § 1304, which prohibits broadcasting "any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance." *Id.* at 285. The FCC defined games of chance to include "give away" contests. *Id.* at 286. Prior to adopting the regulation, the FCC had failed to persuade the Department of Justice to pursue criminal actions against such programs and had urged Congress unsuccessfully to amend the law. *Id.* at 296. Additionally, the Post Office, which administered a similar statute involving the mails, and the Department of Justice had

---

[18] In 2006, Congress added 47 U.S.C. § 503(b)(2)(C) which raised maximum penalties for those found "to have broadcast obscene, indecent, or profane language" to $325,000 per violation, not to exceed an aggregate of $3 million for any single act of failure to act. Broadcast Decency Enforcement Act of 2005, Pub. L. No. 109-235, 120 Stat. 491, 491 (2006).

interpreted the same statutory language to exclude the type of program the FCC wished to regulate. *Id.* at 294. The Court concluded "[t]here cannot be one construction for the Federal Communications Commission and another for the Department of Justice." *Id.* at 296; *see also Leocal v. Ashcroft*, 543 U.S. 1, 11-12 n.8 (2004); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 506-07 (1992) (plurality).[19] CBS contends we must construe § 1464 in the exact same manner as if this were a criminal prosecution.[20]

There is some merit in CBS's position that, as a general matter, a statute should be read consistently in its criminal and civil applications. But in *ABC* (and also *Leocal* and *Thompson*), the Court construed the literal text of a statute, finding no good reason to apply different

---

[19] In *Leocal v. Ashcroft*, 543 U.S. 1 (2004), when interpreting the definition of "crime of violence" contained in 18 U.S.C. § 16 as applied to a civil deportation proceeding, the Court noted that if the definition were ambiguous it would apply the rule of lenity used in criminal proceedings because the statute "has both criminal and noncriminal applications." *Id.* at 12 n.8. Similarly, in *United States v. Thompson/Center Arms Co.*, the Court had to define when a firearm was "made" to determine if a tax on the "making" was owed to the government. 504 U.S. 505, 506-07 (1992) (plurality). To resolve the issue, the Court applied the rule of lenity because "although it is a tax statute that we construe now in a civil setting, the [statute] has criminal applications." *Id.* at 517; *see also id.* at 523 (Scalia, J., concurring in judgment).

[20] Justice Stewart's dissent raised the argument CBS raises here that the statute must be read in keeping with *ABC*, *Pacifica*, 438 U.S. at 780 n.8 (Stewart, J., dissenting), a proposition the plurality rejected in footnote 13.

constructions for civil actions and criminal prosecutions. In this case, there is no text to interpret. The statutes (18 U.S.C § 1464 and 47 U.S.C. § 503(b)(1)(D)) are silent on scienter; as a consequence, we must apply the constitutionally required level of scienter. Furthermore, "[i]f [Congress's] intent is made plain, it is unnecessary for us to refer to other canons of statutory construction, and indeed we should not do so." *In re Am. Home Mortg. Holdings, Inc.*, 637 F.3d 246, 254-55 (3d Cir. 2011). As I have noted, the Supreme Court in *Pacifica* concluded Congress intended the specific provision at issue to be interpreted for civil forfeitures without regard to its application in criminal prosecutions. *Pacifica*, 438 U.S. at 739 n.13. Accordingly, I would read into the statute only the scienter necessary in this context for a civil forfeiture order— the objective standard of civil recklessness.

**3.**

If we were to reject, as I think we should, CBS's arguments under the APA, at issue would be whether the standard of recklessness for a civil forfeiture under §503(b)(1)(D) is subjective (knowledge or awareness of an unjustifiably high risk of harm) or objective (should have been aware of such a risk). I believe an objective standard for recklessness is sufficient to separate wrongful from otherwise innocent conduct.[21] Adoption of a subjective standard,

---

[21] In practice the distinction between a subjective or an objective standard may not always result in differences on liability. The law has traditionally allowed the use of objective evidence to prove a party's subjective state of mind. *See Schiavone Constr. Co. v. Time, Inc*., 847 F.2d 1069, 1090 (3d Cir. 1988) ("[O]bjective circumstantial evidence can

49

namely that for live television broadcasts the broadcaster must know or be aware indecency will occur, risks encouraging deliberate ignorance or failure to use available preventive measures such as delay technology.

In addition to comporting with Congress's intent in creating the civil forfeiture provision of § 503(b)(1)(D), a civil recklessness standard provides protection commensurate with indecency's constitutional status. The First Amendment requires we apply "only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Carter v. United States*, 530 U.S. 255, 269 (2000)

---

suffice to demonstrate actual malice."). The Supreme Court has noted:

> We might observe that it has been some time now since the law viewed itself as impotent to explore the actual state of a man's mind. *See* [Roscoe] Pound, *The Role of the Will in Law*, 68 Harv. L. Rev. 1 [1954]. *Cf. American Communications Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 411 [1950]. Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents. The circumstances may warrant the inference that he was aware of what a book contained, despite his denial.

*Smith v. California*, 361 U.S. 147, 154 (1959); *see also Colorado v. Hall*, 999 P.2d 207, 220 (Colo. 2000) ("In addition to the actor's knowledge and experience, a court may infer the actor's subjective awareness of a risk from what a reasonable person would have understood under the circumstances.").

(quoting *X-Citement Video*, 513 U.S. at 72). The issue presents a difficult question of constitutional law, as the plurality in *Pacifica* noted when it stated, "the constitutional protection accorded to a communication containing such patently offensive sexual and excretory language need not be the same in every context" and noted the Court "tailored its protection" of speech "to both the abuses and the uses to which it might be put." *Pacifica*, 438 U.S. at 747 & n.24. At a minimum, the FCC must show CBS had a sufficient level of culpability to justify a civil forfeiture. Because displays of indecent material "surely lie at the periphery of the First Amendment concern" an objective standard is appropriate. *Fox*, 129 S. Ct. at 1819 (quoting *Pacifica*, 438 U.S. at 743). Furthermore, an objective standard is not without precedent.[22]

---

[22] In other areas such as use of "fighting words"—words inherently likely to provoke a violent reaction—the Court has looked at what reaction a reasonable speaker would expect from the utterance of her speech. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 573 (1942). Recent Supreme Court cases have reaffirmed that some categories of speech are entitled to lesser or even no constitutional protection. There are traditional, though limited, categories where the First Amendment has not protected those who would "disregard these traditional limitations." *United States v. Stevens*, 130 S. Ct. 1577, 1584 (2010) (internal quotation omitted). These categories (including obscenity) "are 'well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.'" *Id.* (quoting *Chaplinsky*, 315 U.S. at 571-72).

Unlike obscenity, indecency enjoys some constitutional protection, but of a lesser kind. *See Pacifica*,

It is not sufficient to show that CBS should have acted differently or was merely negligent. Inadvertence or common negligence will not suffice. CBS contends there is no evidence to support a finding that it acted recklessly. But this is a question of proof committed to the FCC in the first instance. CBS and the FCC continue to contest critical issues. One consideration is the availability of delay technology. CBS and the FCC dispute whether video delay technology could have been implemented at the time of the incident. They also dispute whether CBS should have anticipated that indecent material could be broadcast—e.g., whether Jackson's choreographer's "shocking moments" prediction should have put CBS on notice. Since the FCC appears to have based its forfeiture orders on an erroneous— or, at the least, unclear—standard of liability, after rejecting CBS's APA arguments, I would remand to allow the agency to measure CBS's conduct against the proper *mens rea* standard.

## IV.

In addition to the arguments addressed, CBS contests the FCC's forfeiture orders on the ground that the agency's multi-factor, contextual indecency standard is unconstitutionally vague. In its most recent decision in *Fox*, the United States Court of Appeals for the Second Circuit endorsed this view, *see Fox Television Stations, Inc. v. FCC*,

438 U.S. at 748 ("Patently offensive, indecent material presented over the airwaves confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder."). An objective standard comports with this peripheral status.

613 F.3d 317 (2d Cir. 2010), and CBS encourages us to follow suit. In *Fox*, however, the constitutional question was the primary, if not exclusive, issue left in the case after the Supreme Court's remand. Here, it may be possible to dispose of the action without resolving the constitutional question.

"A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Assn.*, 485 U.S. 439, 445 (1988). Therefore, I would not address the constitutional issue.

## V.

For the foregoing reasons, I would grant the petition for review, vacate the FCC's forfeiture orders, and remand for consideration of the forfeiture order under the proper standard.